Justice KAGAN
delivered the opinion of the Court.
The Double Jeopardy Clause of the Fifth Amendment prohibits more than one prosecution for the “same offence.” But under what is known as the dual-sovereignty doctrine, a single act gives rise to distinct offenses—and thus may subject a person to successive prosecutions—if it violates the laws of separate sovereigns. To determine whether two prosecuting authorities are different sovereigns for double jeopardy purposes, this Court asks a narrow, historically focused question. The inquiry does not turn, as the term “sovereignty” sometimes suggests, on the degree to which the second entity is autonomous from the first or sets its own political course. Rather, the issue is only whether the prosecutorial powers of the two jurisdictions have independent origins—or, said conversely, whether those powers derive from the same “ultimate source.” United States v. Wheeler, 435 U.S. 313, 320, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978).
*1868 In this case, we must decide if, under that test, Puerto Rico and the United States may successively prosecute a single defendant for the same criminal conduct. We hold they may not, because the oldest roots of Puerto Rico’s power to prosecute lie in federal soil.
I
A
Puerto Rico became a territory of the United States in 1898, as a result of the Spanish-American War. The treaty concluding that conflict ceded the island, then a Spanish colony, to the United States, and tasked Congress with determining “[t]he civil rights and political status” of its inhabitants. Treaty of Paris, Art. 9, Dec. 10, 1898, 30 Stat. 1759. In the ensuing hundred-plus years, the United States and Puerto Rico have forged a unique political relationship, built on the island’s evolution into a constitutional democracy exercising local self-rule.
Acting pursuant to the U.S. Constitution’s Territory Clause, Congress initially established a “civil government” for Puerto Rico possessing significant authority over internal affairs. Organic Act of 1900, ch. 191, 31 Stat. 77; see U.S. Const., Art. IV, § 3, cl. 2 (granting Congress the “Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States”). The U.S. President, with the advice and consent of the Senate, appointed the governor, supreme court, and upper house of the legislature; the Puerto Rican people elected the lower house themselves. See §§ 17-35, 31 Stat. 81-85. Federal statutes generally applied (as they still do) in Puerto Rico, but the newly constituted legislature could enact local laws in much the same way as the then-45 States. See §§ 14-15, 32, id., at 80, 83-84; Puerto Rico v. Shell Co. (P. R), Ltd., 302 U.S. 253, 261, 58 S.Ct. 167, 82 L.Ed. 235 (1937).
Over time, Congress granted Puerto Rico additional autonomy. A federal statute passed in 1917, in addition to giving the island’s inhabitants U.S. citizenship, replaced the upper house of the legislature with a popularly elected senate. See Organic Act of Puerto Rico, ch. 145, §§ 5, 26, 39 Stat. 953, 958. And in 1947, an amendment to that law empowered the Puerto Rican people to elect their own governor, a right never before accorded in a U.S. territory. See Act of Aug. 5, 1947, ch. 490, § 1, 61 Stat. 770.
Three years later, Congress enabled Puerto Rico to embark on the project of constitutional self-governance. Public Law 600, “recognizing the principle of government by consent,” authorized the island’s people to “organize a government pursuant to a constitution of their own adoption.” Act of July 3, 1950, § 1, 64 Stat. 319. Describing itself as “in the nature of a compact,” the statute submitted its own terms to an up-or-down referendum of Puerto Rico’s voters. Ibid. According to those terms, the eventual constitution had to “provide a republican form of government” and “include a bill of rights”; all else would be hashed out in a constitutional convention. § 2, 64 Stat. 319. The people of Puerto Rico would be the first to decide, in still another referendum, whether to adopt that convention’s proposed charter. See § 3, 64 Stat. 319. But Congress would cast the dispositive vote: The constitution, Public Law 600 declared, would become effective only “[u]pon approval by the Congress.” Ibid.
Thus began two years of constitution-making for the island. The Puerto Rican people first voted to accept Public Law 600, thereby triggering a constitutional convention. And once that body complet *1869 ed its work, the island’s voters ratified the draft constitution. Congress then took its turn on the document: Before giving its approval, Congress removed a provision recognizing various social welfare rights (including entitlements to food, housing, medical care, and employment); added a sentence prohibiting certain constitutional amendments, including any that would restore the welfare-rights section; and inserted language guaranteeing children’s freedom to attend private schools. See Act of July 3, 1952, 66 Stat. 327; Draft Constitution of the Commonwealth of Puerto Rico (1952), in Documents on the Constitutional Relationship of Puerto Rico and the United States 199 (M. Ramirez Lavandero ed., 3d ed. 1988). Finally, the constitution became law, in the manner Congress had specified, when the convention formally accepted those conditions and the governor “issue[d] a proclamation to that effect.” Ch. 567, 66 Stat. 328.
The Puerto Rico Constitution created a new political entity, the Commonwealth of Puerto Rico—or, in Spanish, Estado Libre Asociado de Puerto Rico. See P.R. Const., Art. I, § 1. Like the U.S. Constitution, it divides political power into three branches—the “legislative, judicial and executive.” Art. I, § 2. And again resonant of American founding principles, the Puerto Rico Constitution describes that tripartite government as “republican in form” and “subordinate to the sovereignty of the people of Puerto Rico.” Ibid. The Commonwealth’s power, the Constitution proclaims, “emanates from the people and shall be exercised in accordance with their will, within the terms of the compact agreed upon between the people of Puerto Rico and the United States.” Art. I, § 1.
B
We now leave the lofty sphere of constitutionalism for the grittier precincts of criminal law. Respondents Luis Sánchez Valle and Jaime Gómez Vázquez (on separate occasions) each sold a gun to an undercover police officer. Commonwealth prosecutors indicted them for, among other things, selling a firearm without a permit in violation of the Puerto Rico Arms Act of 2000. See 25 Laws P.R. Ann. § 458 (2008). While those charges were pending, federal grand juries indicted Sánchez Valle and Gómez Vázquez, based on the same transactions, for violations of analogous U.S. gun trafficking statutes. See 18 U.S.C. §§ 922(a)(1)(A), 923(a), 924(a)(1)(D), 924(a)(2). Both defendants pleaded guilty to those federal charges.
Following their pleas, Sánchez Valle and Gómez Vázquez moved to dismiss the pending Commonwealth charges on double jeopardy grounds. The prosecutors in both cases opposed those motions, arguing that Puerto Rico and the United States are different sovereigns for double jeopardy purposes, and so could bring successive prosecutions against each of the two defendants. The trial courts rejected that view and dismissed the charges. See App. to Pet. for Cert. 307a-352a. But the Puerto Rico Court of Appeals, after consolidating the two cases, reversed those decisions. See id., at 243a-306a.
The Supreme Court of Puerto Rico granted review and held that Puerto Rico’s gun sale prosecutions violated the Double Jeopardy Clause. See id., at la-70a. The majority reasoned that, under this Court’s dual-sovereignty doctrine, “what is crucial” is “[t]he ultimate source” of Puerto Rico’s power to prosecute. Id., at 19a; see id., at 20a (“The use of the word ‘sovereignty’ in other contexts and for other purposes is irrelevant”). Because that power originally “derived from the United States Congress”—i.e., the same source on which federal prosecutors rely—the Commonwealth could not retry Sánchez Valle and Gómez *1870 Vázquez for unlawfully selling firearms. Id., at 66a. Three justices disagreed, believing that the Commonwealth and the United States are separate sovereigns. See id., at 71a-242a.
We granted certiorari, 576 U.S. -, 136 S.Ct. 28, 192 L.Ed.2d 998 (2015), to determine whether the Double Jeopardy Clause bars the Federal Government and Puerto Rico from successively prosecuting a defendant on like charges for the same conduct. We hold that it does, and so affirm.
II
A
This case involves the dual-sovereignty carve-out from the Double Jeopardy Clause. The ordinary rule under that Clause is that a person cannot be prosecuted twice for the same offense. See U.S. Const., Arndt. 5 (“nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb”).[1] But two prosecutions, this Court has long held, are not for the same offense if brought by different sovereigns—even when those actions target the identical criminal conduct through equivalent criminal laws. See, e.g., United States v. Lanza, 260 U.S. 377, 382, 43 S.Ct. 141, 67 L.Ed. 314 (1922). As we have put the point: “[Wjhen the same act transgresses the laws of two sovereigns, it cannot be truly averred that the offender has been twice punished for the same offence; but only that by one act he has committed two offences.” Heath v. Alabama, 474 U.S. 82, 88, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985) (internal quotation marks omitted). The Double Jeopardy Clause thus drops out of the picture when the “entities that seek successively to prosecute a defendant for the same course of conduct [are] separate sovereigns.” Ibid.
Truth be told, however, “sovereignty” in this context does not bear its ordinary meaning. For whatever reason, the test we have devised to decide whether two governments are distinct for double jeopardy purposes overtly disregards common indicia of sovereignty. Under that standard, we do not examine the “extent of control” that “one prosecuting authority [wields] over the other.” Wheeler, 435 U.S., at 320, 98 S.Ct. 1079. The degree to which an entity exercises self-governance—whether autonomously managing its own affairs or continually submitting to outside direction—plays no role in the analysis. See Shell Co., 302 U.S., at 261-262, 264-266, 58 S.Ct. 167. Nor do we care about a government’s more particular ability to enact and enforce its own criminal laws. See Waller v. Florida, 397 U.S. 387, 391-395, 90 S.Ct. 1184, 25 L.Ed.2d 435 (1970). In short, the inquiry (despite its label) does not probe whether a government possesses the usual attributes, or acts in the common manner, of a sovereign entity.[2]
*1871 Rather, as Puerto Rico itself acknowledges, our test hinges on a single criterion: the “ultimate source” of the power undergirding the respective prosecutions. Wheeler, 435 U.S., at 320, 98 S.Ct. 1079; see Brief for Petitioner 26. Whether two prosecuting entities are dual sovereigns in the double jeopardy context, we have stated, depends on “whether [they] draw their authority to punish the offender from distinct sources of power.” Heath, 474 U.S., at 88, 106 S.Ct. 433. The inquiry is thus historical, not functional— looking at the deepest wellsprings, not the current exercise, of prosecutorial authority. If two entities derive their power to punish from wholly independent sources (imagine here a pair of parallel lines), then they may bring successive prosecutions. Conversely, if those entities draw their power from the same ultimate source (imagine now two lines emerging from a common point, even if later diverging), then they may not.[3]
Under that approach, the States are separate sovereigns from the Federal Government (and from one another). See Abbate v. United States, 359 U.S. 187, 195, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959); Bartkus v. Illinois, 359 U.S. 121, 132-137, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959); Heath, 474 U.S., at 88, 106 S.Ct. 433. The States’ “powers to undertake criminal prosecutions,” we have explained, do not “derive[ ] ... from the Federal Government.” Id., at 89, 106 S.Ct. 433. Instead, the States rely on “authority originally belonging to them before admission to the Union and preserved to them by the Tenth Amendment.” Ibid.; see U.S. Const., Arndt. 10 (“The powers not delegated to the United States by the Constitution ... are reserved to the States”); Blatchford v. Native Village of Noatak, 501 U.S. 775, 779, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991) (noting that the States “entered the [Union] with their sovereignty intact”). Said otherwise: Prior to forming the Union, the States possessed “separate and independent sources of power and authority,” which they continue to draw upon in enacting and enforcing criminal laws. Heath, 474 U.S., at 89, 106 S.Ct. 433. State prosecutions therefore have their most ancient roots in an “inherent sovereignty” unconnected to, and indeed pre-existing, the U.S. Congress. Ibid.[4]
*1872 For similar reasons, Indian tribes also count as separate sovereigns under the Double Jeopardy Clause. Originally, this Court has noted, “the tribes were self-governing sovereign political communities,” possessing (among other capacities) the “inherent power to prescribe laws for their members and to punish infractions of those laws.” Wheeler, 435 U.S., at 322-323, 98 S.Ct. 1079. After the formation of the United States, the tribes became “domestic dependent nations,” subject to plenary control by Congress—so hardly “sovereign” in one common sense. United States v. Lara, 541 U.S. 193, 204, 124 S.Ct. 1628, 158 L.Ed.2d 420 (2004) (quoting Cherokee Nation v. Georgia, 5 Pet. 1, 17, 8 L.Ed. 25 (1831)); see Santa Clara Pueblo v. Martinez, 436 U.S. 49, 56, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978) (“Congress has plenary authority to limit, modify or eliminate the [tribes’] powers of local self-government”). But unless and until Congress withdraws a tribal power— including the power to prosecute—the Indian community retains that authority in its earliest form. See Wheeler, 435 U.S., at 323, 98 S.Ct. 1079. The “ultimate source” of a tribe’s “power to punish tribal offenders” thus lies in its “primeval” or, at any rate, “pre-existing” sovereignty: A tribal prosecution, like a State’s, is “attributable in no way to any delegation ... of federal authority.” Id., at 320, 322, 328, 98 S.Ct. 1079; Santa Clara Pueblo, 436 U.S., at 56, 98 S.Ct. 1670. And that alone is what matters for the double jeopardy inquiry.
Conversely, this Court has held that a municipality cannot qualify as a sovereign distinct from a State—no matter how much autonomy over criminal punishment the city maintains. See Waller, 397 U.S., at 395, 90 S.Ct. 1184. Florida law, we recognized in our pivotal case on the subject, treated a municipality as a “separate sovereign entit[y]” for all relevant real-world purposes: The city possessed broad home-rule authority, including the power to enact criminal ordinances and prosecute offenses. Id., at 391, 90 S.Ct. 1184. But that functional control was not enough to escape the double jeopardy bar; indeed, it was wholly beside the point. The crucial legal inquiry was backward-looking: Did the city and State ultimately “derive their powers to prosecute from independent sources of authority”? Heath, 474 U.S., at 90, 106 S.Ct. 433 (describing Waller ⅛ reasoning). Because the municipality, in the first instance, had received its power from the State, those two entities could not bring successive prosecutions for a like offense.
*1873 And most pertinent here, this Court concluded in the early decades of the last century that U.S. territories—including an earlier incarnation of Puerto Rico itself—are not sovereigns distinct from the United States. In Grafton v. United States, 206 U.S. 333, 355, 27 S.Ct. 749, 51 L.Ed. 1084 (1907), we held that the Philippine Islands (then a U.S. territory, also acquired in the Spanish-American War) could not prosecute a defendant for murder after a federal tribunal had acquitted him of the same crime. We reasoned that whereas “a State does not derive its powers from the United States,” a territory does: The Philippine courts “exert[ed] all their powers by authority of’ the Federal Government. Id., at 354, 27 S.Ct. 749. And then, in Shell Co., we stated that “[t]he situation [in Puerto Rico] was, in all essentials, the same.” 302 U.S., at 265, 58 S.Ct. 167. Commenting on a Puerto Rican statute that overlapped with a federal law, we explained that this “legislative duplication [gave] rise to no danger of a second prosecution” because “the territorial and federal laws [were] creations emanating from the same sovereignty.” Id., at 264, 58 S.Ct. 167; see also Heath, 474 U.S., at 90, 106 S.Ct. 433 (noting that federal and territorial prosecutors “d[o] not derive their powers to prosecute from independent sources of authority”).[5]
B
With that background established, we turn to the question presented: Do the *1874 prosecutorial powers belonging to Puerto Rico and the Federal Government derive from wholly independent sources? See Brief for Petitioner 26-28 (agreeing with that framing of the issue). If so, the criminal charges at issue here can go forward; but if not, not. In addressing that inquiry, we do not view our decisions in Grafton and Shell Co. as, in and of themselves, controlling. Following 1952, Puerto Rico became a new kind of political entity, still closely associated with the United States but governed in accordance with, and exercising self-rule through, a popularly ratified constitution. The magnitude of that change requires us to consider the dual-sovereignty question anew. And yet the result we reach, given the legal test we apply, ends up the same. Puerto Rico today has a distinctive, indeed exceptional, status as a self-governing Commonwealth. But our approach is historical. And if we go back as far as our doctrine demands— to the “ultimate source” of Puerto Rico’s prosecutorial power, Wheeler, 435 U.S., at 320, 98 S.Ct. 1079—we once again discover the U.S. Congress.
Recall here the events of the mid-20th century—when Puerto Rico, just as petitioner contends, underwent a profound change in its political system. See Brief for Petitioner 1-2 (“[T]he people of Puerto Rieo[] engaged in an exercise of popular sovereignty ... by adopting their own Constitution establishing their own government to enact their own laws”); supra, at 1868 - 1869. At that time, Congress enacted Public Law 600 to authorize Puer-to Rico’s adoption of a constitution, designed to replace the federal statute that then structured the island’s governance. The people of Puerto Rico capitalized on that opportunity, calling a constitutional convention and overwhelmingly approving the charter it drafted. Once Congress approved that proposal—subject to several important conditions accepted by the convention—the Commonwealth, a new political entity, came into being.
Those constitutional developments were of great significance—and, indeed, made Puerto Rico “sovereign” in one commonly understood sense of that term. As this Court has recognized, Congress in 1952 “relinquished its control over [the Commonwealth’s] local affairs[,] grant[ing] Puerto Rico a measure of autonomy comparable to that possessed by the States.” Examining Bd. of Engineers, Architects and Surveyors v. Flores de Otero, 426 U.S. 572, 597, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976); see id., at 594, 96 S.Ct. 2264 (“[T]he purpose of Congress in the 1950 and 1952 legislation was to accord to Puer-to Rico the degree of autonomy and independence normally associated with States of the Union”); Rodriguez v. Popular Democratic Party, 457 U.S. 1, 8, 102 S.Ct. 2194, 72 L.Ed.2d 628 (1982) (“Puerto Rico, like a state, is an autonomous political entity, sovereign over matters not ruled by the [Federal] Constitution” (internal quotation marks omitted)). That newfound authority, including over local criminal laws, brought mutual benefit to the Puerto Rican people and the entire United States. See Brief for United States as Amicus Curiae 3. And if our double jeopardy decisions hinged on measuring an entity’s self-governance, the emergence of the Commonwealth would have resulted as well in the capacity to bring the kind of successive prosecutions attempted here.
But as already explained, the dual-sovereignty test we have adopted focuses on a different question: not on the fact of self-rule, but on where it came from. See supra, at 1870 - 1871. We do not care, for example, that the States presently exercise autonomous control over criminal law and other local affairs; instead, we treat them as separate sovereigns because they possessed such control as an original matter, *1875 rather than deriving it from the Federal Government. See supra, at 1871 - 1872. And in identifying a prosecuting entity’s wellspring of authority, we have insisted on going all the way back—beyond the immediate, or even an intermediate, locus of power to what we have termed the “ultimate source.” Wheeler, 435 U.S., at 320, 98 S.Ct. 1079. That is why we have emphasized the “inherent,” “primeval,” and “pre-existing” capacities of the tribes and States—the power they enjoyed prior to the Union’s formation. Id., at 322-323, 328, 98 S.Ct. 1079; Heath, 474 U.S., at 90, 106 S.Ct. 433; Santa Clara Pueblo, 436 U.S., at 56, 98 S.Ct. 1670; see supra, at 1871 - 1873. And it is why cities fail our test even when they enact and enforce their own criminal laws under their own, popularly ratified charters: Because a State must initially authorize any such charter, the State is the furthest-back source of prosecutorial power. See Waller, 397 U.S., at 391-394, 90 S.Ct. 1184; supra, at 1872 -1873.
On this settled approach, Puerto Rico cannot benefit from our dual-sovereignty doctrine. For starters, no one argues that when the United States gained possession of Puerto Rico, its people possessed independent prosecutorial power, in the way that the States or tribes did upon becoming part of this country. Puerto Rico was until then a colony “under Spanish sovereignty.” Treaty of Paris, Art. 2, 30 Stat. 1755. And local prosecutors in the ensuing decades, as petitioner itself acknowledges, exercised only such power as was “delegated by Congress” through federal statutes. Brief for Petitioner 28; see Shell Co., 302 U.S., at 264-265, 58 S.Ct. 167; supra, at 1872 - 1873. Their authority derived from, rather than pre-existed association with, the Federal Government.
And contrary to petitioner’s claim, Puerto Rico’s transformative constitutional moment does not lead to a different conclusion. True enough, that the Commonwealth’s power to enact and enforce criminal law now proceeds, just as petitioner says, from the Puerto Rico Constitution as “ordain[ed] and establish[ed]” by “the people.” P.R. Const., Preamble; see Brief for Petitioner 28-30. But that makes the Puerto Rican populace only the most immediate source of such authority—and that is not what our dual-sovereignty decisions make relevant. Back of the Puerto Rican people and their Constitution, the “ultimate” source of prosecutorial power remains the U.S. Congress, just as back of a city’s charter lies a state government. Wheeler, 435 U.S., at 320, 98 S.Ct. 1079. Congress, in Public Law 600, authorized Puerto Rico’s constitution-making process in the first instance; the people of a territory could not legally have initiated that process on their own. See, e.g., Simms v. Simms, 175 U.S. 162, 168, 20 S.Ct. 58, 44 L.Ed. 115 (1899). And Congress, in later legislation, both amended the draft charter and gave it the indispensable stamp of approval; popular ratification, however meaningful, could not have turned the convention’s handiwork into law.[6] Put simply, Congress conferred the authority to create the Puerto Rico Constitution, which in turn confers the authority to bring criminal charges. That makes Congress the original source of power for Puerto Rico’s prosecutors—as it is for the *1876 Federal Government’s. The island’s Constitution, significant though it is, does not break the chain.
Petitioner urges, in support of its different view, that Congress itself recognized the new Constitution as “a democratic manifestation of the [people’s] will,” Brief for Petitioner 2—but far from disputing that point, we readily acknowledge it to be so. As petitioner notes, Public Law 600 affirmed the “principle of government by consent” and offered the Puerto Rican public a “compact,” under which they could “organize a government pursuant to a constitution of their own adoption.” § 1, 64 Stat. 319; see Brief for Petitioner 2, 29; supra, at 1868. And the Constitution that Congress approved, as petitioner again underscores, declares that “[w]e, the people” of Puerto Rico, “create” the Commonwealth—a new political entity, “republican in form,” in which the people’s will is “sovereign ]” over the government. P.R. Const., Preamble and Art. I, §§ 1-2; see Brief for Petitioner 2, 29-30; supra, at 1869. With that consented-to language, Congress “allow[ed] the people of Puerto Rico,” in petitioner’s words, to begin a new chapter of democratic self-governance. Reply Brief 20.
All that separates our view from petitioner’s is what that congressional recognition means for Puerto Rico’s ability to bring successive prosecutions. We agree that Congress has broad latitude to develop innovative approaches to territorial governance, see U.S. Const., Art. IV, § 3, cl. 2; that Congress may thus enable a territory’s people to make large-scale choices about their own political institutions; and that Congress did exactly that in enacting Public Law 600 and approving the Puerto Rico Constitution—prime examples of what Felix Frankfurter once termed “inventive statesmanship” respecting the island. Memorandum for the Secretary of War, in Hearings on S. 4604 before the Senate Committee on Pacific Islands and Porto Rico, 63d Cong., 2d Sess., 22 (1914); see Reply Brief 18-20. But one power Congress does not have, just in the nature of things: It has no capacity, no magic wand or airbrush, to erase or otherwise rewrite its own foundational role in conferring political authority. Or otherwise said, the delegator cannot make itself any less so—no matter how much authority it opts to hand over. And our dual-sovereignty test makes this historical fact dispositive: If an entity’s authority to enact and enforce criminal law ultimately comes from Congress, then it cannot follow a federal prosecution with its own. That is true of Puerto Rico, because Congress authorized and approved its Constitution, from which prosecutorial power now flows. So the Double Jeopardy Clause bars both Puerto Rico and the United States from prosecuting a single person for the same conduct under equivalent criminal laws.
Ill
Puerto Rico boasts “a relationship to the United States that has no parallel in our history.” Examining Bd., 426 U.S., at 596, 96 S.Ct. 2264. And since the events of the early 1950’s, an integral aspect of that association has been the Commonwealth’s wide-ranging self-rule, exercised under its own Constitution. As a result of that charter, Puerto Rico today can avail itself of a wide variety of futures. But for purposes of the Double Jeopardy Clause, the future is not what matters—and there is no getting away from the past. Because the ultimate source of Puerto Rico’s prose-cutorial power is the Federal Government—because when we trace that authority all the way back, we arrive at the doorstep of the U.S. Capitol—the Commonwealth and the United States are not separate sovereigns. That means the two *1877 governments cannot “twice put” respondents Sánchez Valle and Gómez Vázquez “in jeopardy” for the “same offence.” U.S. Const., Arndt. 5. We accordingly affirm the judgment of the Supreme Court of Puerto Rico.

It is so ordered.

. Because the parties in this case agree that the Double Jeopardy Clause applies to Puerto Rico, we have no occasion to consider that question here. See Brief for Petitioner 19-21; Brief for Respondents 20, n. 4; see also Brief for United States as Amicus Curiae 10, n. 1 (concurring).

. The dissent, ignoring our longstanding precedent to the contrary, see supra, at 1870 - 1871; infra, at 1870 - 1873, advances an approach of just this stripe; Its seven considerations all go to the question whether the Commonwealth, by virtue of Public Law 600, gained “the sovereign authority to enact and enforce” its own criminal laws. Post, at 1880 (opinion of BREYER, J.). Our disagreement with the dissent arises entirely from its use of this test. If the question is whether, after the events of 1950-1952, Puerto Rico had authority to enact and enforce its own criminal laws (or, slightly differently phrased, whether Congress then decided that it should have such autonomy), the answer (all can and do agree) is yes. See infra, at 1874 - 1876. But as we *1871 now show, that is not the inquiry our double jeopardy law has made relevant: To the contrary, we have rejected that approach again and again—and so reached results inconsistent with its use. See, e.g., Heath v. Alabama, 474 U.S. 82, 88-91, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985); Waller v. Florida, 397 U.S. 387, 391-395, 90 S.Ct. 1184, 25 L.Ed.2d 435 (1970); see infra, at 1870 - 1873.

. The Court has never explained its reasons for adopting this historical approach to die dual-sovereignty doctrine. It may appear counter-intuitive, even legalistic, as compared to an inquiry focused on a governmental entity’s functional autonomy. But that alternative would raise serious problems of application. It would require deciding exactly how much autonomy is sufficient for separate sovereignty and whether a given entity’s exercise of self-rule exceeds that level. The results, we suspect, would often be uncertain, introducing error and inconsistency into our double jeopardy law. By contrast, as we go on to show, the Court has easily applied the "ultimate source” test to classify broad classes of governments as either sovereign or not for purposes of barring retrials. See infra, at 1871- 1873.

. Literalists might object that only the original 13 States can claim such an independent source of authority; for the other 37, Congress played some role in establishing them as territories, authorizing or approving their constitutions, or (at the least) admitting them to the Union. See U.S. Const., Art. IV, § 3, cl. 1 ("New States may be admitted by the Congress into this Union”). And indeed, that is the tack the dissent takes. See post, at 1878 - 1879 (claiming that for this reason the Federal Government is "the ‘source’ of [later-admitted] States’ legislative powers”). But *1872 this Court long ago made clear that a new State, upon entry, necessarily becomes vested with all the legal characteristics and capabilities of the first 13. See Coyle v. Smith, 221 U.S. 559, 566, 31 S.Ct. 688, 55 L.Ed. 853 (19 lp (noting that the very meaning of " 'a State’ is found in the powers possessed by the original States which adopted the Constitution”). That principle of “equal footing,” we have held, is essential to ensure that the nation remains "a union of States[ alike] in power, dignity and authority, each competent to exert that residuum of sovereignty not delegated to the United States.” Id., at 567, 31 S.Ct. 688; see Northwest Austin Municipal Util. Dist. No. One v. Holder, 557 U.S. 193, 203, 129 S.Ct. 2504, 174 L.Ed.2d 140 (2009) (referring to the "fundamental principle of equal sovereignty” among the States). Thus, each later-admitted State exercises its authority to enact and enforce criminal laws by virtue not of congressional grace, but of the independent powers that its earliest counterparts both brought to the Union and chose to maintain. See Coyle, 221 U.S., at 573, 31 S.Ct. 688 ("[W]hen a new State is admitted into the Union, it is so admitted with all the powers of sovereignty and jurisdiction which pertain to the original States”). The dissent’s contrary view—that, say, Texas's or California’s powers (including the power to make and enforce criminal law) derive from the Federal Government—contradicts the most fundamental conceptual premises of our constitutional order, indeed the very bedrock of our Union.

. The dissent’s theory, see supra, at 1870 - 1871, n. 2, cannot explain any of these (many) decisions, whether involving States, Indian tribes, cities, or territories. We have already addressed the dissent's misunderstanding with respect to the States, including the later-admitted ones. See supra, at 1871, and n. 4. This Court's reasoning could not have been plainer; The States (all of them) are separate sovereigns for double jeopardy purposes not (as the dissent claims) because they exercise authority over criminal law, but instead because that power derives from a source independent of the Federal Government. See Heath, 474 U.S., at 89, 106 S.Ct. 433. So too for the tribes, see supra, at 1872 - 1873; and, indeed, here the dissent’s contrary reasoning is deeply disturbing. According to the dissent, Congress is in fact “the ‘source’ of the Indian tribes’ criminal-enforcement power” because it has elected not to disturb the exercise of that authority. Post, at 1880. But beginning with Chief Justice Marshall and continuing for nearly two centuries, this Court has held firm and fast to the view that Congress's power over Indian affairs does nothing to gainsay the profound importance of the tribes’ pre-existing sovereignty. See Worcester v. Georgia, 6 Pet. 515, 559-561, 8 L.Ed. 483 (1832); Talton v. Mayes, 163 U.S, 376, 384, 16 S.Ct. 986, 41 L.Ed. 196 (1896); Michigan v. Bay Mills Indian Community, 572 U.S. -,-, 134 S.Ct. 2024, 2029-2031, 188 L.Ed.2d 1071 (2014). And once again, we have stated in no uncertain terms that the tribes are separate sovereigns precisely because of that inherent authority. See Wheeler, 435 U.S., at 328, 98 S.Ct. 1079. Next, the dissent cannot (and does not even try to) explain our rule that a municipality is not a separate sovereign from a State. See supra, at 1872 - 1873. As this Court has explicitly recognized, many cities have (in the words of the dissent’s test) wide-ranging "authority to make and enforce [their] own criminal laws,” post, at 1880; still, they cannot undertake successive prosecutions—because they received that power from state governments, see Waller, 397 U.S., at 395, 90 S.Ct. 1184. And likewise (finally), the dissent fails to face up to our decisions that the territories are not distinct sovereigns from the United States because the powers they exercise are delegations from Congress. See Grafton v. United States, 206 U.S. 333, 355, 27 S.Ct. 749, 51 L.Ed. 1084 (1907); supra, at 1872 - 1873. That, of course, is what makes them different from the current Philippines, see post, at 1878 - 1879, whose relevance here is hard to fathom. As an independent nation, the Philippines wields prosecutorial power that is not traceable to any congressional conferral of authority. And that, to repeat, is what matters; If an entity’s capacity to make and enforce criminal law ultimately comes from another government, then the two are not separate sovereigns for double jeopardy purposes.

. Petitioner’s own statements are telling as to the role Congress necessarily played in this constitutional process. See, e.g., Reply Brief 1-2 ("Pursuant to Congress' invitation, and with Congress’ consent, the people of Puerto Rico engaged in an exercise of popular sovereignty”); id., at 7 ("The Commonwealth’s legal cornerstone is Public Law 600”); Tr. of Oral Arg. 19 (describing the adoption of the Puerto Rico Constitution as "pursuant to the invitation of Congress and with the blessing of Congress”).