**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 28, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

     No. 19-1213

MERLE DENEZPI,

     Defendant - Appellant.

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:18-CR-00267-REB-JMC)**
_____

Theresa M. Duncan, Duncan Earnest LLC, Santa Fe, New Mexico, for Defendant-Appellant.

Jeffrey K. Graves, Assistant United States Attorney (Jason R. Dunn, United States Attorney, with him on the brief), Durango, Colorado for the Plaintiff-Appellee.
_____

Before **HOLMES, SEYMOUR,** and **PHILLIPS,** Circuit Judges.
_____

**SEYMOUR**, Circuit Judge.
_____

Merle Denezpi, a Navajo tribal member, was arrested by Ute Mountain Ute tribal authorities and charged with violating the Tribe's assault and battery laws, as well as two provisions of the Code of Federal Regulations on terroristic threats and false imprisonment. He subsequently entered an *Alford* plea[1] to the assault and battery charge and was released from custody for time served. Six months later, Mr. Denezpi was indicted in the United States District Court for the District of Colorado for aggravated sexual assault in violation of 18 U.S.C. §§ 2241(A)(1)-(2) & 1153(a). The court denied Mr. Denezpi's motion to dismiss the indictment on double jeopardy grounds.

At trial, the victim (V.Y.) testified that Mr. Denezpi had previously been incarcerated and implied that he had abused his ex-girlfriend. The court denied Mr. Denezpi's motion to strike the testimony. The jury convicted him and he was sentenced to 360 months' imprisonment. He appeals the denial of his motion to dismiss on double jeopardy grounds as well as the denial of his motion to strike the victim's testimony at trial. We affirm.

I.

Merle Denezpi and V.Y. are both Navajo tribal members. On July 17, 2017, Mr. Denezpi and V.Y. traveled from Shiprock, New Mexico to Mr. Denezpi's girlfriend's house in Towaoc, Colorado, which is within the Ute Mountain Ute Indian reservation. Inside the house, Mr. Denezpi allegedly threatened V.Y., barricaded the door, and forced

---

[1] In *North Carolina v. Alford*, 400 U.S. 25, 33, 38 (1970), the Supreme Court allowed for the acceptance of a guilty plea where the plea "contains only a waiver of trial but no admission of guilt."

V.Y. to engage in non-consensual sex. Mr. Denezpi allegedly threatened V.Y. with physical harm if she left the house and he hid her clothing to prevent her from going to the police.

A.    *Investigation of the assault*

While Mr. Denezpi was sleeping in the early morning of July 18, V.Y. traveled on foot from the house to the nearby Ute Mountain Ute casino. Shortly after arriving, V.Y. was arrested for public intoxication and for an outstanding warrant for an unpaid fine. While being transported to the local jail, V.Y. reported the assault to the tribal authorities, who began an investigation. V.Y. underwent a Sexual Assault Nurse Exam (SANE). The SANE nurse documented twenty-four injuries to V.Y.'s body including bruises on her breasts, back, arms, and legs, as well as seven injuries to her genitals, including her cervix and vaginal walls.

Approximately two hours after she reported the assault, officers arrived at Mr. Denezpi's girlfriend's house to investigate V.Y.'s assault allegations. Mr. Denezpi testified at trial that when he heard the officers knock, he fled through the second-floor window, hiding in a neighbor's yard for approximately thirteen hours. When the police found Mr. Denezpi, he gave multiple contradictory accounts of the events with V.Y. and repeatedly denied any sexual contact with her. After the officers confronted him with the possibility of DNA evidence, Mr. Denezpi claimed he and V.Y. had engaged in consensual sex. He admitted at trial that he lied to the police multiple times.

*B.*     *Mr. Denezpi's prosecution by the Ute Mountain Ute Tribe*

On July 20, Mr. Denezpi was arrested by tribal authorities and charged in the Court of Indian Offenses of the Ute Mountain Ute Agency ("CFR Court")[2] with assault and battery under 6 Ute Mountain Ute Code § 2, and with terroristic threats and false imprisonment under 25 C.F.R. §§ 11.402, 11.404.  Mr. Denezpi entered an *Alford* plea to the assault charge and on December 6, 2017 he was released from custody for time served.  The remaining charges were dismissed.

*C.*     *Mr. Denezpi's prosecution in federal court for sexual assault*

Six months later, Mr. Denezpi was indicted by a federal grand jury on one count of aggravated sexual abuse in Indian Country in violation of 18 U.S.C. §§ 2241(a)(1)-(2) and 1153(a).  He moved to dismiss the indictment, claiming it violated the Fifth Amendment's Double Jeopardy Clause.  The district court denied the motion to dismiss.

At trial, V.Y. testified for the government and was cross-examined by defense counsel.  In response to defense counsel's questions about how she knew Mr. Denezpi, V.Y. testified that she had previously seen Mr. Denezpi "when he got out of jail.  I didn't know he got out of prison."  Rec., vol. V at 95.  No objection was made to this testimony.  V.Y. also testified that she had seen Mr. Denezpi with his girlfriend who was "all beat up . . . [and] abused."  *Id.* at 96.  Defense counsel moved pursuant to Rule 403 of the Federal Rules of Evidence to strike V.Y.'s answer from the record on the grounds that its probative value was substantially outweighed by the danger of unfair prejudice.  The

---

[2] Also known as Courts of Indian Offenses, CFR courts are so-called because they operate pursuant to federal regulations.  *See* 25 C.F.R. § 11.100 *et. seq.*

district court denied the motion. Neither the government nor defense counsel discussed V.Y.'s response in closing arguments.

The jury returned a guilty verdict and the court sentenced Mr. Denezpi to 360 months in prison and ten years of supervised release. He appeals both the denial of his motion to dismiss the indictment for double jeopardy and the denial of his motion to strike V.Y.'s testimony.

II.

Mr. Denezpi contends that his trial in federal district court subsequent to the proceedings before the CFR court violated the Fifth Amendment's guarantee against double jeopardy. Whether a prosecution constitutes double jeopardy is "a question of law we review de novo." *United States v. Leal*, 921 F.3d 951, 958 (10th Cir. 2019) (quoting *United States v. Rodriguez-Aguirre*, 73 F.3d 1023, 1024-25 (10th Cir. 1996)). "The defendant bears the burden of proving a claim of double jeopardy." *Id.* at 959 (citation omitted).

The Fifth Amendment prohibits more than one prosecution for "the same offence." U.S. Const. amend. V. The dual-sovereignty doctrine recognizes that "a crime under one sovereign's laws is not 'the same offence' as a crime under the laws of another sovereign." *Gamble v. United States*, 139 S. Ct. 1960, 1964 (2019). Therefore, "a single act . . . may subject a person to successive prosecutions[] if it violates the laws of separate sovereigns." *Puerto Rico v. Sanchez Valle*, 136 S. Ct. 1863, 1867 (2016).

All parties agree that the Ute Mountain Ute Tribe has the inherent power to prosecute criminal offenses committed by an Indian on its sovereign lands and that the

5

source of this power is the Ute Mountain Ute Tribe's "pre-existing sovereignty." *Id.* at 1872 (internal quotation marks and citations omitted). Mr. Denezpi, however, asserts that the source of power to prosecute crimes in Indian Country in the CFR courts is derived, at least in part, from federal power rather than from tribal sovereignty. He therefore contends that his prosecution by both the CFR court and the federal district court violated the Fifth Amendment's Double Jeopardy Clause.

"To determine whether two prosecuting authorities are different sovereigns for double jeopardy purposes, . . . the issue is only whether the prosecutorial powers of the two jurisdictions have independent origins . . . ." *Sanchez-Valle*, 136 S. Ct. at 1867. The dual sovereignty test, then, "hinges on a single criterion: the 'ultimate source' of the power undergirding the respective prosecutions." *Id.* at 1871 (internal citation omitted). "The inquiry is thus historical, not functional–looking at the deepest wellsprings, not the current exercise, of prosecutorial authority." *Id.* Put simply, the issue in this case is whether the power to prosecute Mr. Denezpi in the CFR court is derived from tribal sovereignty or from the federal government.

We begin with history. Prior to the establishment of the United States, Native American "tribes were self-governing sovereign political communities." *United States v. Wheeler*, 435 U.S. 313, 322-23 (1978) (citing *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 172 (1973)). "Like all sovereign bodies, [the tribes] had the inherent power to prescribe laws for their members and to punish infractions of those laws." *Id.* at 323. The incorporation of tribal territories into the United States served to limit, but not eliminate, tribal sovereignty. *See id.* ("Indian tribes still possess those aspects of

6

sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status.")  One power that the tribes retained despite their dependency was "the power to prescribe and enforce internal criminal laws . . . ."  *Id.* at 326.

In an effort to promote "the then-prevailing federal policy of assimilation," Congress created the Courts of Indian Offences, known today as CFR courts, to "promote acculturation on the reservations . . . ."  Vincent C. Milani, Comment, *The Right to Counsel in Native American Tribal Courts: Tribal Sovereignty and Congressional Control*, 31 Am. Crim. L. Rev. 1279, 1281 (1994).  But the Indian Reorganization Act of 1934 ushered in a changed approach to federal-Indian relations and "increased [the] authority delegated to the tribes . . . pav[ing] the way for tribes to develop tribal courts and phase out the C.F.R. courts."  *Id.*  Most CFR courts have since been replaced by tribal courts with only five regional CFR courts currently operating across the country, one of which is the Southwest Region CFR Court serving the Ute Mountain Ute Tribe. *See* Court of Indian Offenses, Bureau of Indian Aff., https://www.bia.gov/CFRCourts (last visited Oct. 14, 2020).

CFR courts exist today "to provide adequate machinery for the administration of justice for Indian tribes in those areas of Indian country where tribes retain jurisdiction over Indians that is exclusive of State jurisdiction but where tribal courts have not been established to exercise that jurisdiction."  25 C.F.R. § 11.102.  While CFR courts are not tribal courts, they nevertheless "function as tribal courts" and provide the "judicial forum through which the tribe can exercise its jurisdiction until such time as the tribe adopts a

7

formal law and order code." *Tillett v. Lujan*, 931 F.2d 636, 640 (10th Cir. 1991) (citations omitted).

In *Wheeler*, the Supreme Court recognized that "[t]he powers of Indian tribes are, in general, '*inherent powers of a limited sovereignty which has never been extinguished*.'" 435 U.S. at 322 (citing F. Cohen, Handbook of Federal Indian Law 122 (1945)) (emphasis in original). The Court thus held that when a tribe prosecutes a tribal member, the tribe acts as an "independent sovereign" and therefore the Double Jeopardy Clause does not bar tribal and federal prosecution. *Id.* at 329-30. While the Court in *Wheeler* declined to address the issue we take on today—whether the CFR court "is an arm of the Federal Government or . . . derives its powers from the inherent sovereignty of the tribe," *id.* at 327 n.26—the Court's reasoning in *Wheeler* also applies to the CFR courts.

When Congress created courts for the administration of justice on reservations, all Indian courts were CFR courts. *Wheeler* established that the tribal courts, which have replaced the majority of CFR courts, derive their power from the inherent "primeval sovereignty" of the tribes that "***has never been taken away*** . . . and is attributable in no way to any delegation to them of federal authority." *Id.* at 328 (emphasis added). Congress's creation of CFR courts, then, did not divest the tribes of their self-governing power[3] but instead merely provided the forum through which the tribes could exercise that power until a tribal court replaced the CFR court. "That Congress has in certain

---

[3] A tribe's power of self-government includes the "tribe's jurisdiction to punish its members for infractions of tribal law." *Wheeler*, 435 U.S. at 332.

ways regulated the manner and extent of the tribal power of self-government does not mean that Congress is the source of that power." *Id.* Moreover, while the CFR courts "retain some characteristics of an agency of the federal government," *Tillet*, 931 F.2d at 640, the Bureau of Indian Affairs serves only to administer the CFR courts as the "machinery" that exercises the tribal power. *See* 25 C.F.R. § 11.102.

Notably, the Courts of Indian Appeals, the appellate body for the CFR courts, have recognized tribal sovereignty as the source of power for the CFR courts, which "may most accurately be characterized as [] 'federally administered tribal court[s]'." *Gallegos v. French*, 2 Okla. Trib. 209, 234, 235 (Delaware CIA 1991) (explaining that a CFR court "asserts the sovereignty of the Indian tribe for which it sits," and operates as "a tribal court which is administered by the federal government"); *Ponca Tribal Election Board v. Snake*, 1 Okla. Trib. 209, 227-28 (Ponca CIA 1988) ("Courts of Indian Offenses . . . function primarily as tribal courts, exercising the inherent sovereignty of the Indian tribe. In fact, most courts fully administered by tribes today are the successor entities to previously established Courts of Indian Offenses."). As the Court of Appeals for the Kiowa Tribe explained:

> [CFR courts] have been acknowledged to operate under the residual sovereignty of the tribes as well as under the authority of the federal government . . . .
>
> The Interior Department may provide funding and initial laws and regulations of the court and may refer to these courts as 'federal courts' . . . but such is not exclusive of tribal sovereignty. The tribes can create their own courts independently or use or authorize the use of the CFR courts as their own.

*Kiowa Election Bd. v. Lujan*, 1 Okla. Trib. 140, 151-52 (Kiowa CIA 1987).

9

Mr. Denezpi asserts that the CFR's power is derived from a dual wellspring of both federal and tribal power. He claims the Courts of Indian Appeals decisions "acknowledge tribal sovereignty, [but] also recognize that the CFR courts operate under the authority of the federal government, not just the tribes." Aplt. Br. at 16. But Mr. Denezpi misses the point. Because it has never been withdrawn, the "'ultimate source' of the power undergirding" the CFR prosecution of Mr. Denezpi is the Ute Mountain Ute Tribe's inherent sovereignty. *Sanchez Valle*, 136 S. Ct. at 1871. Therefore, the subsequent prosecution of Mr. Denezpi in the federal district court did not violate the Fifth Amendment's prohibition against Double Jeopardy.

## III.

Mr. Denezpi also contends the trial court erred when it declined to strike V.Y.'s testimony that Mr. Denezpi had previously served time and had abused his girlfriend. Rule 403 permits a district court to exclude evidence when "its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. Generally, "[w]e review for abuse of discretion a properly-preserved Rule 403 objection to the district court's decision to admit evidence." *United States v. Archuleta*, 737 F.3d 1287, 1292 (10th Cir. 2013) (citation omitted).

In this case, we need not address whether the district court erred. Even if the district court improperly denied Mr. Denezpi's motion to strike the testimony of V.Y., the admission of the testimony was harmless. Harmless error is "[a]ny error, defect, irregularity, or variance that does not affect substantial rights." Fed. R. Crim. P. 52(a). The standard we apply to harmless error review turns on whether the error is

10

constitutional.  *United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir. 1990) (en banc). We have previously determined that errors under Rule 403 are reviewed under the non-constitutional harmless error analysis.  *See United States v. Cristerna-Gonzalez*, 962 F.3d 1253, 1266-67 (10th Cir. 2020).  "A non-constitutional error is harmless unless it had a 'substantial influence' on the outcome or leaves one in 'grave doubt' as to whether it had such effect."  *Rivera*, 900 F.2d at 1469 (citing *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).

Here, the evidence against Mr. Denezpi is overwhelming.  The SANE examination of V.Y. revealed substantial injuries to her body, including bruising on her breasts, back, arms, and legs as well as injuries to her genitals.  Mr. Denezpi's DNA was found on V.Y.'s genitalia.  The SANE nurse testified at trial that V.Y.'s injuries were "consistent with a nonconsensual sexual assault."  Rec., vol. V at 394.  Mr. Denezpi told the police multiple times that he had no sexual contact with V.Y. before claiming consensual sex had occurred.  At trial, he admitted that he hid from the investigating police officers on the day after the incident and that he lied several times to the officers when they questioned him about the events.  Given these circumstances, we are not persuaded that V.Y.'s challenged testimony had "a 'substantial influence' on the outcome" nor is there "'grave doubt' as to whether it had such effect."  *Rivera*, 900 F.2d at 1469 (citation omitted).  Accordingly, any error in including the testimony was harmless.

For the foregoing reasons, WE AFFIRM.