Justice THOMAS, concurring.
I agree that the historical record does not bear out my initial skepticism of the dual-sovereignty doctrine. See Puerto Ricov.Sánchez Valle , 579 U.S. ----, 136 S.Ct. 1863, 195 L.Ed.2d 179 (2016) (GINSBURG, J., joined by THOMAS, J. concurring). The founding generation foresaw very limited potential for overlapping criminal prosecutions by the States and the Federal Government.[1] The Founders therefore had no reason to address the double jeopardy question that the Court resolves today. Given their understanding of Congress' limited criminal jurisdiction and the absence of an analogous dual-sovereign system in England, it is difficult to conclude that the People who ratified the Fifth Amendment understood it to prohibit prosecution by a State and the Federal Government for the same offense. And, of course, we are not entitled to interpret the Constitution to align it with our personal sensibilities about " 'unjust' "
*1981 prosecutions. Post , at 1992 (GINSBURG, J., dissenting); see Currierv.Virginia , 585 U.S. ----, ----, 138 S.Ct. 2144, 2156, 201 L.Ed.2d 650 (2018) (plurality opinion) ("While the growing number of criminal offenses in our statute books may be cause for concern, no one should expect (or want) judges to revise the Constitution to address every social problem they happen to perceive" (citation omitted)).
I write separately to address the proper role of the doctrine of stare decisis . In my view, the Court's typical formulation of the stare decisis standard does not comport with our judicial duty under Article III because it elevates demonstrably erroneous decisions-meaning decisions outside the realm of permissible interpretation-over the text of the Constitution and other duly enacted federal law. It is always "tempting for judges to confuse our own preferences with the requirements of the law," Obergefellv.Hodges , 576 U.S. ----, ----, 135 S.Ct. 2584, 2612, 192 L.Ed.2d 609 (2015) (ROBERTS, C.J., dissenting), and the Court's stare decisis doctrine exacerbates that temptation by giving the veneer of respectability to our continued application of demonstrably incorrect precedents. By applying demonstrably erroneous precedent instead of the relevant law's text-as the Court is particularly prone to do when expanding federal power or crafting new individual rights-the Court exercises "force" and "will," two attributes the People did not give it. The Federalist No. 78, p. 465 (C. Rossiter ed. 1961) (capitalization omitted).
We should restore our stare decisis jurisprudence to ensure that we exercise "mer[e] judgment," ibid. , which can be achieved through adherence to the correct, original meaning of the laws we are charged with applying. In my view, anything less invites arbitrariness into judging.[2]
I
The Court currently views stare decisis as a " 'principle of policy' " that balances several factors to decide whether the scales tip in favor of overruling precedent. Citizens United v. Federal Election Comm'n , 558 U.S. 310, 363, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010) (quoting Helvering v. Hallock , 309 U.S. 106, 119, 60 S.Ct. 444, 84 L.Ed. 604 (1940) ). Among these factors are the "workability" of the standard, "the antiquity of the precedent, the reliance interests at stake, and of course whether the decision was well reasoned." Montejo v. Louisiana , 556 U.S. 778, 792-793, 129 S.Ct. 2079, 173 L.Ed.2d 955 (2009). The influence of this last factor tends to ebb and flow with the Court's desire to achieve a particular end, and the Court may cite additional, ad hoc factors to reinforce the result it chooses. But the shared theme is the need for a "special reason over and above the belief that a prior case was wrongly decided" to overrule a precedent. Planned Parenthood of Southeastern Pa. v. Casey , 505 U.S. 833, 864, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). The Court has advanced this view of stare decisis on the ground that "it promotes the evenhanded, predictable, and consistent development of legal principles" and "contributes to the actual and perceived integrity of the judicial process." Payne v. Tennessee , 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).
This approach to stare decisis might have made sense in a common-law legal system in which courts systematically developed *1982 the law through judicial decisions apart from written law. But our federal system is different. The Constitution tasks the political branches-not the Judiciary-with systematically developing the laws that govern our society. The Court's role, by contrast, is to exercise the "judicial Power," faithfully interpreting the Constitution and the laws enacted by those branches. Art. III, § 1.
A
A proper understanding of stare decisis in our constitutional structure requires a proper understanding of the nature of the "judicial Power" vested in the federal courts. That "Power" is-as Chief Justice Marshall put it-the power "to say what the law is" in the context of a particular "case" or "controversy" before the court. Marbury v. Madison , 1 Cranch 137, 177, 2 L.Ed. 60 (1803) ; Art. III, § 2. Phrased differently, the "judicial Power" "is fundamentally the power to decide cases in accordance with law." Lawson, The Constitutional Case Against Precedent, 17 Harv. J. L. & Pub. Pol'y 23, 26 (1994) (Lawson). It refers to the duty to exercise "judicial discretion" as distinct from "arbitrary discretion." The Federalist No. 78, at 468, 471.
That means two things, the first prohibitory and the second obligatory. First, the Judiciary lacks "force" (the power to execute the law) and "will" (the power to legislate). Id. , at 465 (capitalization omitted). Those powers are vested in the President and Congress, respectively. "Judicial power is never exercised for the purpose of giving effect to the will of the Judge; always for the purpose of giving effect to the will of the Legislature; or, in other words, to the will of the law." Osborn v. Bank of United States , 9 Wheat. 738, 866, 6 L.Ed. 204 (1824) (Marshall, C.J.). The Judiciary thus may not "substitute [its] own pleasure to the constitutional intentions of the legislature." The Federalist No. 78, at 468-469.
Second, "judicial discretion" requires the "liquidat[ion]" or "ascertain[ment]" of the meaning of the law. Id., at 467-468; see id. , No. 37. At the time of the founding, "to liquidate" meant "to make clear or plain"; "to render unambiguous; to settle (differences, disputes)." Nelson, Stare Decisis and Demonstrably Erroneous Precedents, 87 Va. L. Rev. 1, 13, and n. 35 (2001) (Nelson) (quoting 8 Oxford English Dictionary 1012 (2d ed. 1991); (internal quotation marks omitted)). Therefore, judicial discretion is not the power to "alter" the law; it is the duty to correctly "expound" it. Letter from J. Madison to N. Trist (Dec. 1831), in 9 The Writings of James Madison 477 (G. Hunt ed. 1910) (Writings of Madison).
B
This understanding of the judicial power had long been accepted at the time of the founding. But the federalist structure of the constitutional plan had significant implications for the exercise of that power by the newly created Federal Judiciary. Whereas the common-law courts of England discerned and defined many legal principles in the first instance, the Constitution charged federal courts primarily with applying a limited body of written laws articulating those legal principles. This shift profoundly affects the application of stare decisis today.
Stare decisis has its pedigree in the unwritten common law of England. As Blackstone explained, the common law included "[e]stablished customs" and "[e]stablished rules and maxims" that were discerned and articulated by judges. 1 W. Blackstone, Commentaries on the Laws of England 68-69 (1765) (Blackstone). In the common-law system, stare decisis played *1983 an important role because "judicial decisions [were] the principal and most authoritative evidence, that [could] be given, of the existence of such a custom as shall form a part of the common law." Id. , at 69. Accordingly, "precedents and rules must be followed, unless flatly absurd or unjust," because a judge must issue judgments "according to the known laws and customs of the land" and not "according to his private sentiments" or "own private judgment." Id., at 69-70. In other words, judges were expected to adhere to precedents because they embodied the very law the judges were bound to apply.
"[C]ommon law doctrines, as articulated by judges, were seen as principles that had been discovered rather than new laws that were being made." 3-4 G. White, The Marshall Court and Cultural Change, 1815-35, History of the Supreme Court of the United States 129 (1988).[3] "It was the application of the dictates of natural justice, and of cultivated reason, to particular cases." 1 J. Kent, Commentaries on American Law 439 (1826) (Kent); see id. , at 439-440 (the common law is " 'not the product of the wisdom of some one man, or society of men, in any one age; but of the wisdom, counsel, experience, and observation, of many ages of wise and observing men' "). The common law therefore rested on "unarticulated social processes to mobilize and coordinate knowledge" gained primarily through "the social experience of the many," rather than the "specifically articulated reason of the few." T. Sowell, A Conflict of Visions: Ideological Origins of Political Struggles 49, 42 (1987). In other words, the common law was based in the collective, systematic development of the law through reason. See id., at 49-55.
Importantly, however, the common law did not view precedent as unyielding when it was "most evidently contrary to reason" or "divine law." Blackstone 69-70. The founding generation recognized that a "judge may mistake the law." Id. , at 71; see also 1 Kent 444 ("Even a series of decisions are not always conclusive evidence of what is law"). And according to Blackstone, judges should disregard precedent that articulates a rule incorrectly when necessary "to vindicate the old [rule] from misrepresentation." Blackstone 70; see also 1 Kent 443 ("If ... any solemnly adjudged case can be shown to be founded in error, it is no doubt the right and the duty of the judges who have a similar case before them, to correct the error"). He went further: When a "former decision is manifestly absurd or unjust" or fails to conform to reason, it is not simply "bad law," but "not law" at all. Blackstone 70 (emphasis). This view-that demonstrably erroneous "blunders" of prior courts should be corrected-was accepted by state courts throughout the 19th century. See, e.g., McDowell v. Oyer , 21 Pa. 417, 423 (1853) ; Guild v. Eager , 17 Mass. 615, 622 (1822).
This view of precedent implies that even common-law judges did not act as legislators, inserting their own preferences into the law as it developed. Instead, consistent with the nature of the judicial power, common-law judges were tasked with identifying and applying objective principles of law-discerned from natural reason, custom, and other external sources-to particular cases. See Nelson 23-27. Thus, the founding generation understood that an important function of the Judiciary in a *1984 common-law system was to ascertain what reason or custom required; that it was possible for courts to err in doing so; and that it was the Judiciary's responsibility to "examin[e] without fear, and revis[e] without reluctance," any "hasty and crude decisions" rather than leaving "the character of [the] law impaired, and the beauty and harmony of the system destroyed by the perpetuity of error." 1 Kent 444.
Federal courts today look to different sources of law when exercising the judicial power than did the common-law courts of England. The Court has long held that "[t]here is no federal general common law." Erie R. Co. v. Tompkins , 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Instead, the federal courts primarily interpret and apply three bodies of federal positive law-the Constitution; federal statutes, rules, and regulations; and treaties.[4] That removes most (if not all) of the force that stare decisis held in the English common-law system, where judicial precedents were among the only documents identifying the governing "customs" or "rules and maxims." Blackstone 68. We operate in a system of written law in which courts need not-and generally cannot-articulate the law in the first instance. See U.S. Const., Art. I, § 1 (vesting "[a]ll legislative Powers" in Congress); Art. 1, § 7 (describing the bicameralism and presentment process). The Constitution, federal statutes, and treaties are the law, and the systematic development of the law is accomplished democratically. Our judicial task is modest: We interpret and apply written law to the facts of particular cases.
Underlying this legal system is the key premise that words, including written laws, are capable of objective, ascertainable meaning. As I have previously explained, "[m]y vision of the process of judging is unabashedly based on the proposition that there are right and wrong answers to legal questions." THOMAS, Judging, 45 U. Kan. L. Rev. 1, 5 (1996). Accordingly, judicial decisions may incorrectly interpret the law, and when they do, subsequent courts must confront the question when to depart from them.
C
Given that the primary role of federal courts today is to interpret legal texts with ascertainable meanings, precedent plays a different role in our exercise of the "judicial Power" than it did at common law. In my view, if the Court encounters a decision that is demonstrably erroneous-i.e. , one that is not a permissible interpretation of the text-the Court should correct the error, regardless of whether other factors support overruling the precedent. Federal courts may (but need not) adhere to an incorrect decision as precedent, but only when traditional tools of legal interpretation show that the earlier decision adopted a textually permissible interpretation of the law. A demonstrably incorrect judicial decision, by contrast, is tantamount to making law, and adhering to it both disregards the supremacy of the Constitution and perpetuates a usurpation of the legislative power.
1
When faced with a demonstrably erroneous precedent, my rule is simple: We should not follow it. This view of stare decisis follows directly from the Constitution's supremacy over other sources of law-including our own precedents. That *1985 the Constitution outranks other sources of law is inherent in its nature. See A. Amar, America's Constitution 5 (2005) (explaining that the Constitution is a constitutive document); Kesavan, The Three Tiers of Federal Law, 100 NW.U. L. Rev. 1479, 1499, n. 99 (2006) (arguing that "[i]t is unnecessary for the Constitution to specify that it is superior to other law because it is higher law made by We the People-and the only such law"). The Constitution's supremacy is also reflected in its requirement that all judicial officers, executive officers, Congressmen, and state legislators take an oath to "support this Constitution." Art. VI, cl. 3 ; see also Art. II, § 1, cl. 8 (requiring the President to "solemnly swear (or affirm)" to "preserve, protect and defend the Constitution of the United States"). Notably, the Constitution does not mandate that judicial officers swear to uphold judicial precedents. And the Court has long recognized the supremacy of the Constitution with respect to executive action and "legislative act[s] repugnant to" it. Marbury , 1 Cranch at 177 ; Youngstown Sheet & Tube Co. v. Sawyer , 343 U.S. 579, 587-589, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) ; see also The Federalist No. 78, at 467 ("No legislative act, therefore, contrary to the Constitution, can be valid").
The same goes for judicial precedent. The "judicial Power" must be understood in light of "the Constitution's status as the supreme legal document" over "lesser sources of law." Lawson, 29-30. This status necessarily limits "the power of a court to give legal effect to prior judicial decisions" that articulate demonstrably erroneous interpretations of the Constitution because those prior decisions cannot take precedence over the Constitution itself. Ibid. Put differently, because the Constitution is supreme over other sources of law, it requires us to privilege its text over our own precedents when the two are in conflict. I am aware of no legitimate reason why a court may privilege a demonstrably erroneous interpretation of the Constitution over the Constitution itself.[5]
The same principle applies when interpreting statutes and other sources of law: If a prior decision demonstrably erred in interpreting such a law, federal judges should exercise the judicial power-not perpetuate a usurpation of the legislative power-and correct the error. A contrary rule would permit judges to "substitute their own pleasure" for the law. The Federalist No. 78, at 468; see id., at 466 (" '[T]here is no liberty if the power of judging be not separated from the legislative and executive powers' ").
In sum, my view of stare decisis requires adherence to decisions made by the People-that is, to the original understanding of the relevant legal text-which may not align with decisions made by the Court. Accord, Marshall v. Baltimore & Ohio R. Co. , 16 How. 314, 343-344, 14 L.Ed. 953 (1854) (Daniel, J., dissenting) ("Wherever the Constitution commands, discretion terminates" because continued *1986 adherence to "palpable error" is a "violation of duty, an usurpation"); Commonwealth v. Posey , 8 Va. 109, 116 (1787) (opinion of Tazewell, J.) ("[A]lthough I venerate precedents, I venerate the written law more"). Thus, no " 'special justification' " is needed for a federal court to depart from its own, demonstrably erroneous precedent. Halliburton Co. v. Erica P. John Fund, Inc. , 573 U.S. 258, 266, 134 S.Ct. 2398, 189 L.Ed.2d 339 (2014) ; see Nelson 62. Considerations beyond the correct legal meaning, including reliance, workability, and whether a precedent "has become well embedded in national culture," S. BREYER, Making our Democracy Work: A Judge's View 152 (2010), are inapposite. In our constitutional structure, our role of upholding the law's original meaning is reason enough to correct course.[6]
2
Although precedent does not supersede the original meaning of a legal text, it may remain relevant when it is not demonstrably erroneous. As discussed, the "judicial Power" requires the Court to clarify and settle-or, as Madison and Hamilton put it, to "liquidate"-the meaning of written laws. The Federalist No. 78, at 468 ("[I]t is the province of the courts to liquidate and fix [the] meaning and operation [of contradictory laws]"); The Federalist No. 37, at 229 (explaining that the indeterminacy of laws requires courts to "liquidat[e] and ascertai[n]" their meaning "by a series of particular discussions and adjudications"). This need to liquidate arises from the inability of human language to be fully unequivocal in every context. Written laws "have a range of indeterminacy," and reasonable people may therefore arrive at different conclusions about the original meaning of a legal text after employing all relevant tools of interpretation. See Nelson 11, 14. It is within that range of permissible interpretations that precedent is relevant. If, for example, the meaning of a statute has been "liquidated" in a way that is not demonstrably erroneous (i.e., not an impermissible interpretation of the text), the judicial policy of stare decisis permits courts to constitutionally adhere to that interpretation, even if a later court might have ruled another way as a matter of first impression. Of course, a subsequent court may nonetheless conclude that an incorrect precedent should be abandoned, even if the precedent might fall within the range of permissible interpretations. But nothing in the Constitution requires courts to take that step.
Put another way, there is room for honest disagreement, even as we endeavor to find the correct answer. Compare McIntyre v. Ohio Elections Comm'n , 514 U.S. 334, 358-371, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) ( ) (THOMAS, J., concurring in judgment) (concluding that the "historical evidence from the framing" supports the view that the First Amendment permitted anonymous speech), with id. , at 371-385, 115 S.Ct. 1511 (Scalia, J., dissenting) (concluding that the First Amendment does not protect anonymous speech based on a century of practice in the States). Reasonable jurists can apply traditional tools of construction and arrive at different interpretations of legal texts.
*1987 "[L]iquidating" indeterminacies in written laws is far removed from expanding or altering them. See Writings of Madison 477 (explaining that judicial decisions cannot "alter" the Constitution, only "expound" it). The original meaning of legal texts "usually ... is easy to discern and simple to apply." A. Scalia, Common Law Courts in a Civil-Law System, in A Matter of Interpretation: Federal Courts and the Law 45 (A. Gutmann ed. 1997). And even in difficult cases, that the original meaning is not obvious at first blush does not excuse the Court from diligently pursuing that meaning. Stopping the interpretive inquiry short-or allowing personal views to color it-permits courts to substitute their own preferences over the text. Although the law may be, on rare occasion, truly ambiguous-meaning susceptible to multiple, equally correct legal meanings-the law never "runs out" in the sense that a Court may adopt an interpretation beyond the bounds of permissible construction.[7] In that regard, a legal text is not capable of multiple permissible interpretations merely because discerning its original meaning "requires a taxing inquiry." Pauley v. BethEnergy Mines, Inc. , 501 U.S. 680, 707, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991) (Scalia, J., dissenting).
This case is a good example. The historical record presents knotty issues about the original meaning of the Fifth Amendment, and Justice GORSUCH does an admirable job arguing against our longstanding interpretation of the Double Jeopardy Clause. Although Justice GORSUCH identifies support for his view in several postratification treatises, see post, at 2002 - 2004 (dissenting opinion), I do not find these treatises conclusive without a stronger showing that they reflected the understanding of the Fifth Amendment at the time of ratification. At that time, the common law certainly had not coalesced around this view, see ante, at 1968 - 1975, and petitioner has not pointed to contemporaneous judicial opinions or other evidence establishing that his view was widely shared. This lack of evidence, coupled with the unique two-sovereign federalist system created by our Constitution, leaves petitioner to rely on a general argument about "liberty." Ultimately, I am not persuaded that our precedent is incorrect as an original matter, much less demonstrably erroneous.
3
Although this case involves a constitutional provision, I would apply the same stare decisis principles to matters of statutory interpretation. I am not aware of any legal (as opposed to practical) basis for applying a heightened version of stare decisis to statutory-interpretation decisions. Statutes are easier to amend than the Constitution, but our judicial duty is to apply the law to the facts of the case, regardless of how easy it is for the law to change. Cf. Clark v. Martinez , 543 U.S. 371, 402, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005) (THOMAS, J., dissenting) (explaining that "the realities of the legislative process" will "often preclude readopting the original meaning of a statute that we have upset"). Moreover, to the extent the Court has justified statutory stare decisis based on legislative inaction, this view is based on the "patently false premise that the correctness of statutory construction is to be measured by what the current Congress desires, rather than by what the law as enacted meant."
*1988 Johnson v. Transportation Agency, Santa Clara Cty. , 480 U.S. 616, 671, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987) (Scalia, J., dissenting). Finally, even if congressional silence could be meaningfully understood as acquiescence, it still falls short of the bicameralism and presentment required by Article I and therefore is not a "valid way for our elected representatives to express their collective judgment." Nelson 76.
II
For the reasons explained above, the Court's multifactor approach to stare decisis invites conflict with its constitutional duty. Whatever benefits may be seen to inhere in that approach-e.g. , "stability" in the law, preservation of reliance interests, or judicial "humility," Tr. of Oral Arg. 20, 41-42-they cannot overcome that fundamental flaw.
In any event, these oft-cited benefits are frequently illusory. The Court's multifactor balancing test for invoking stare decisis has resulted in policy-driven, "arbitrary discretion." The Federalist No. 78, at 471. The inquiry attempts to quantify the unquantifiable and, by frequently sweeping in subjective factors, provides a ready means of justifying whatever result five Members of the Court seek to achieve. See Holder v. Hall , 512 U.S. 874, 943-944, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994) (THOMAS, J., concurring in judgment) (describing a " 'totality of circumstances' " test as "an empty incantation-a mere conjurer's trick"); Lawrence v. Texas , 539 U.S. 558, 577, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) (acknowledging that stare decisis is " 'a principle of policy and not a mechanical formula' "); see also Casey , 505 U.S. at 854-856, 112 S.Ct. 2791 (invoking the "kind of reliance that would lend a special hardship to the consequences of overruling and add inequity to the cost of repudiation"). These are not legal questions with right and wrong answers; they are policy choices. See, e.g., A. Goldberg, Equal Justice: The Warren Era of the Supreme Court 96 (1971) ("[T]his concept of stare decisis both justifies the overruling involved in the expansion of human liberties during the Warren years and counsels against the future overruling of the Warren Court libertarian decisions").
Members of this Court have lamented the supposed "uncertainty" created when the Court overrules its precedent. See Franchise Tax Bd. of Cal. v.Hyatt , --- U.S. ----, ---- - ----, 139 S.Ct. 1485, 1506, --- L.Ed.2d ---- (2019) (BREYER, J., dissenting). But see Lawrence , supra, at 577, 123 S.Ct. 2472 (asserting that not overruling precedent would "caus[e] uncertainty"). As I see it, we would eliminate a significant amount of uncertainty and provide the very stability sought if we replaced our malleable balancing test with a clear, principled rule grounded in the meaning of the text.
The true irony of our modern stare decisis doctrine lies in the fact that proponents of stare decisis tend to invoke it most fervently when the precedent at issue is least defensible. See, e.g., Holder , supra , at 944-945, 114 S.Ct. 2581 (opinion of THOMAS, J.) ("Stare decisis should not bind the Court to an interpretation of the Voting Rights Act that was based on a flawed method of statutory construction from its inception" and that has created "an irreconcilable conflict" between the Act and the Equal Protection Clause and requires "methodically carving the country into racially designated electoral districts"). It is no secret that stare decisis has had a "ratchet-like effect," cementing certain grievous departures from the law into the Court's jurisprudence. Goldberg, supra, at 96. Perhaps the most egregious example of this illegitimate use of stare decisis can be found in our "substantive due process" jurisprudence.
*1989 McDonald v. Chicago , 561 U.S. 742, 811, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) (THOMAS, J., concurring in part and concurring in judgment). The Court does not seriously defend the "legal fiction" of substantive due process as consistent with the original understanding of the Due Process Clause. Ibid. And as I have explained before, "this fiction is a particularly dangerous one" because it "lack[s] a guiding principle to distinguish 'fundamental' rights that warrant protection from nonfundamental rights that do not." Ibid. Unfortunately, the Court has doggedly adhered to these erroneous substantive-due-process precedents again and again, often to disastrous ends. See, e.g., Stenberg v. Carhart , 530 U.S. 914, 982, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000) (THOMAS, J., dissenting) ("The standard set forth in the Casey plurality has no historical or doctrinal pedigree" and "is the product of its authors' own philosophical views about abortion" with "no origins in or relationship to the Constitution"). Likewise, the Court refuses to reexamine its jurisprudence about the Privileges or Immunities Clause, thereby relegating a " 'clause in the constitution' " " 'to be without effect.' " McDonald , supra , at 813, 130 S.Ct. 3020 (quoting Marbury , 1 Cranch at 174 ); see Timbs v. Indiana , 586 U.S. ----, ----, 139 S.Ct. 682, 691-698, 203 L.Ed.2d 11 (2019) (THOMAS, J., concurring in judgment) (criticizing the Court's incorporation doctrine through a clause that addresses procedures). No subjective balancing test can justify such a wholesale disregard of the People's individual rights protected by the Fourteenth Amendment.
* * *
Our judicial duty to interpret the law requires adherence to the original meaning of the text. For that reason, we should not invoke stare decisis to uphold precedents that are demonstrably erroneous. Because petitioner and the dissenting opinions have not shown that the Court's dual-sovereignty doctrine is incorrect, much less demonstrably erroneous, I concur in the majority's opinion.

See, e.g. , The Massachusetts Body of Liberties of 1641, cl. 42, in The Colonial Laws of Massachusetts 42-43 (W. Whitmore ed. 1889); 4 W. Blackstone, Commentaries on the Laws of England 335-336 (5th ed. 1773) (Blackstone, Commentaries); 2 W. Hawkins, Pleas of the Crown 368 (1762) (Hawkins).

Ex parte Lange , 18 Wall. 163, 170, 21 L.Ed. 872 (1874). See also Benton v. Maryland , 395 U.S. 784, 795-796, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969) ; F. Wharton, Criminal Law of the United States 147 (1846).