(PRIZE.)

## The Rugen.—BUHRING, Claimant.

A question of proprietary interest, and of trading with the enemy.

APPEAL from the circuit court for the district of Georgia. The Schooner Rugen and cargo were libelled in the district court for that district, as prize of war, either as belonging to the enemies of the United States, or as the property of citizens who had been trading with the enemy. A claim was interposed by Mr. Buhring, a subject of the king of Sweden, on the ground that both vessel and cargo belonged to him, and were, *bona fide,* neutral property. This claim was rejected by the district court; which sentence was affirmed by the circuit court, and thereupon the claimant appealed to this court.

*Charlton,* for the appellant and claimant, stated, that the ship was formerly British, had been captured, condemned as prize of war in the district court, and sold by the marshal to one Bixby, who sold to Buhring, the present claimant. 1. He cited the case of the Sisters[a] as to the proprietary interest, and argued, that the regularity of the papers is *prima facie* evidence of neutrality, and conclusive, unless rebutted by contradictory proof. The primi-

a 5 *Rob.* 141.

tive national character of the ship was changed by condemnation, and the sale to a neutral was legal.[b] Testimony was irregularly admitted, which was neither taken *in preparatorio*, nor found on board, nor invoked from any other captured vessel. 2. The voyage was strictly within the range of neutral rights. If the neutral character of the ship and cargo was established, the destination was immaterial, whether to an enemy or neutral port. But the ship was, in fact, destined to a neutral port, and diverted from her course by the enemy's vessel La Decouverte. False papers may be used, if not to cover enemy's property, or evade belligerent rights;[c] and this court is not bound to take notice of, or enforce, the revenue laws of other countries. 3. The property ought to be restored with costs and damages; because the documentary evidence proclaimed the neutral character of the ship and cargo.

The *Attorney General* and *Pinkney*, for the respondents and captors, stated, that this was one of the plainest cases for condemnation that ever came into a court of prize, upon two grounds:

1st. That the real property was not in the claimant, but in a citizen of the United States.

2d. That it was taken trading with the enemy.

1. In the Odin,[d] where the papers were complete, and the *res gesta* similar to the transactions in this

b 1 *Rob*. 104. The Welvaart.
c 1 *Rob*. 139. The Vrouw. 3 *Rob*. 147. The Flora and Commercium. 4 *Rob*. 166. The Convenientia. *Ib*. 87. The Caroline.
d 1 *Rob*. 208.

case, confiscation was decreed. The conduct and resources of the claimant were the same as those of Krefting, the Dane. According to the doctrine of Sir William Scott, exercising ownership by the same master is conclusive;[e] but here the former owner continued to exercise dominion over the thing pretended to be transferred in his own proper person. The ship also continued in her originally intended employment, which was another badge of fraud.[f] The cases cited were of a transfer by the enemy to a neutral, and the former master continued: but here the citizen wishing to trade with the enemy takes a foreign garb to deceive, not a foreign, but his own government. This case is to be arranged under that branch of public law which depends upon the municipal law of allegiance; and the presumption is more irresistible than in the other, where the property is taken and proceeded against as enemy's property. The *vis major*, by which it is alleged the ship was compelled to enter an enemy's port on the outward voyage, is not such as would be admitted as an excuse for deviation, even in a fiscal case, or in an action on a policy of insurance. The endorsement of the ship's papers by the enemy's vessel might have produced a certain effect; but in the view of the law of nations, a parol order could have no effect, tending to confiscation in a prize court, or even detention for trial. The falsification and spoliation of papers, in this case would alone be sufficient to justify condemnation.

e 1 *Rob.* 217. The Odin.
f 6 *Rob.* 71. The Omnibus. 4 *Rob.* 26. The Jenny.
g 1 *Rob.* 111. 131. The Two Brothers.

1816.

The
Rugen.

Spoliation of papers may be explained by the preparatory examinations so as to affect the question of *costs* only; but here, taken in connexion with the simulated papers, the false destination, and the other circumstances of *mala fides*, it is conclusive. Much of the evidence in the case, according to the strict regularity of prize practice, is inadmissible; but the proceedings may be considered as equivalent to an order for farther proof. The case of the Sisters was before the court of admiralty as an Instance Court; an equitable title, conflicting with a legal, and there being no *constat* of property, the court, according to the notions which prevail in England, could not interfere. 2. Supposing the property to be in the claimant, it cannot be restored; he was a resident in the United States, and carried on a trade with the enemy, contrary to the obligations of his temporary allegiance. And supposing the ship to have been compelled to enter the enemy's port by *vis major*, the purchase of a return cargo would import confiscation, being a voluntary act of trading with the enemy. Costs and damages ought to be

*i* A neutral subject domiciled in the belligerant state, is considered as a merchant of that country, so as to render his property taken in trade with the enemy liable to capture and confiscation, in the same manner as that of persons owing permanent allegiance to the state. 3 *Rob.* 26. The Indian Chief. The converse of the rule is also applied to subjects or citizens of the belligerant state resident in a neutral country, whose trade with the enemy is considered as lawful; except in contraband of war, which is deemed inconsistent with their permanent allegiance, and, it may be added, is equally prohibited to them in their character of neutral merchants. Vide 6 *Rob.* 408. The Neptunus.

awarded to the captors, it being a fraudulent case, and the property delivered to the appellant upon bail.

*Charleton*, for the appellant and claimant, in reply. A national character is impressed by the flag and pass. If the property is neutral, the master had a right to clear out with a false destination, according to the authority of the Neptunus, since it is not usual to clear out from one hostile port to another. The simulated papers were not intended for the purpose, and could not have the effect, of defrauding this country of its rights as a power at war. The destruction of papers was accidental, and the circumstances of the case are not like those of the Odin.

Feb. 20th.    LIVINGSTON, J., delivered the opinion of the court.

It has been contended, that this vessel and cargo were *bona fide* the property of the appellant, a subject of Sweden, who had a right to trade with the enemy of the United States; and that having done nothing to forfeit his neutral character, both the sentences below were erroneous, and ought to be reversed. To entitle himself to such reversal, the claimant has undertaken to show, and insists that he has shown, that at the time of, and previous to, the departure of the Rugen from the United States, she, as well as the cargo on board, was his property, and that he was then, and still is, a subject of the king of Sweden, with whom the United States were at peace.

The court will now proceed to inquire how far Mr.

Buhring has succeeded in establishing the facts on which he relies for a restitution of this property. In pursuing this inquiry, it may become unnecessary to decide whether the papers which were on board were sufficient to entitle the Rugen to the privileges or national character of a Swedish vessel; because, whatever may be their regularity and effect, yet, if the court shall be of opinion that they were only colourable, and that an American citizen, and not the claimant, was owner of the vessel and cargo, it will not be pretended that belligerant rights can be eluded in this way; or that the subject of a state at war can, under cover of neutral muniments, however regularly procured, or formal they may be, violate, with impunity, his duty and allegiance to his own country. So far from such documents, when intended only as a cover, affording any protection to the property, they render the party resorting to them doubly criminal, by the scene of fraud and perjury which must be waded through in order to obtain them; and then, in case of disaster, to make a court believe that such papers disclose nothing but the real truth of the case. The whole controversy will then be resolved into the single question, whether, in point of fact, Mr. Buhring, or Messrs. Samuel and Charles Howard, who are citizens of the United States, were owners of the Rugen and her cargo at the time of her sailing from Savannah, and on her return to the United States. It must ever be a painful task to investigate testimony where a result unfavourable to the claimant can only proceed from a conviction that the principal agents in the transac-

*1816.*

*The
Rugen.*

tion have acted either fraudulently, or contrary to their known duty as good citizens. Such is the duty now imposed on the court.

The claimant is said to be a Swede. If this he admitted, and it seems not to be denied, we are compelled, by the very suspicious circumstances of this case, to look beyond his national character, and to inquire very particularly into his situation at the time he embarked, or became connected with this adventure. Had he ever been a merchant in his own country, or elsewhere? Had he ever resided in any of our seaports, or carried on business of any kind there, or in any other place? Had he, at any time, means to purchase this vessel and cargo; or was he sufficiently known to have acquired a credit to that extent? These questions were all asked by the advocate of the captors, to which no satisfactory answer was given on the argument; and it is in vain that the proceedings are searched for a solution of either of them at all favourable to the present claim. On the contrary, easily as every difficulty on these points might have been dispelled, if this were a fair proceeding, no attempt of the kind has been made, or if it has, it has terminated in establishing that Mr. Buhring's situation and circumstances were such as preclude all reasonable doubt of his being any other than the *ostensible* owner of the vessel and cargo. He was a young man, only twenty-one years old, residing, as well as his brother William, in South Carolina, with Mr. Scarborough, Vice Commercial Agent of the king of Sweden, for the state of Georgia. From this retirement he is drawn, and, for the

first time, introduced to the notice of the mercantile world by the Messrs. Howards, who appear to be merchants of considerable property and credit, residing at Savannah, in the State of Georgia. Between these gentlemen and Mr. Buhring there could have been but very little previous acquaintance; for the latter arrived at Savannah from Europe only two or three months before we find him engaged in th concerns of the Rugen; and after remaining not more than three or four days in that city he went to reside in the country of South Carolina, whence he did not return to Savannah until he came back with Mr. C. Howard, a very few days before the Rugen sailed. It is not, then, harsh to presume, that the strongest and only recommendation of Mr. Buhring was his national character. The Messrs. Howards appear, at the time, to have been in search of a Swede, and were not long in meeting with one whose youth and inexperience well fitted him for the purposes for which, there is so much reason to believe, he was wanted. A feeble attempt, however, has been made to show that Mr. Buhring was not without credit as well as funds. To the former point one witness has been examined, and to establish that he was not entirely destitute of property, it has been shown that he actually gave two notes, amounting, together, to about 4,300 dollars, for the Rugen and her cargo, in the month of May, 1813, payable in four months after date; that these notes, as they became due, were taken up by him with great punctuality at one of the banks in Savannah. Whether these notes were really made at the time when they bear date, may

1816

The Rugen.

well be doubted; but it admits of no doubt that they were discharged with the proper moneys of the Messrs. Howards, which had almost the moment before been drawn, by one of them, out of the bank, and put into the hands of Mr. Buhring for that purpose. With the funds, then, of Mr. Howard, and not with those of Mr. Buhring, were these notes taken up; and a contrivance, which was intended to make Mr. Buhring appear as a man of property, has not only altogether failed, but has added very considerable weight to the suggestion of the captors, that he was a young man totally destitute of the means of purchasing and paying for the property which, it is now alleged, belonged to him. But we now find Mr. Buhring at Savannah; and what is done with him? or what does he do with himself, on his arrival there? Does he go about to purchase a vessel? Does he, when he is told that the Rugen belongs to him, take any measures to fit her out? Does he provide a crew? Does he agree for their wages? Does he purchase a cargo? Does he see to its being put on board? Does he effect insurance? or is he found doing any one act which might naturally be expected from an owner? All this trouble had already been most kindly taken off his hands by his new friend and acquaintance, Mr. Howard. This gentleman had already (if we are to believe the history of this transaction as it is narrated by the claimant) provided him with a vessel and cargo, although it does not appear that he had instructions or funds of Mr. Buhring for the purpose. It is true, that with a caution that was very excusable, consider-

ing the circumstances of Mr. Buhring, the bill of sale which had been executed by the marshal, with a blank for the name of the vendee, was not put into the possession of Mr. Buhring, but carefully retained by the Messrs. Howards, they executing to him one in their own names, although they now say they never were the owners of the vessel. And even this bill of sale, it is very probable, remained in the custody of Mr. Samuel Howard during the whole of the voyage to Jamaica and back to the United States. Every thing being now in readiness for their departure from Savannah, Mr. Buhring appears on board, and is introduced to the mate and crew, not merely as owner of vessel and cargo, but as master for the voyage. Whether any surprise were excited on board by the new character in which the claimant appeared, or whether they expressed any reluctance at placing themselves under his command, we know not; nor is it a fact very necessary to ascertain, because they must soon have discovered that Mr. Samuel Howard, whose friendship for Mr. Buhring seems to have had no limit, and in whose seamanship they may have had full confidence, intended to go with the vessel, and relieve Mr. Buhring from the troublesome task, if he were equal to it, of navigating the Rugen. For this conduct, on the part of Mr. Howard, no other reasonable motive can be assigned than an interest in the vessel and cargo. The allegation of his going after certain funds in Carthagena is not at all made out. The Rugen leaves Savannah on the 5th or 6th of May, bound, as is alleged, for Carthagena, but arrives at Kingston, in

the island of Jamaica. The court is not at all satis-
fied with the excuses which have been made for her
going there. It does not appear that a *vis major* of
any kind existed. She was neither forced in by ad-
verse winds, nor was she under any restraint from
capture. When within only four leagues of the island
she was boarded by a British brig of war called La
Decouverte, whose commander ordered her into
Kingston. He put no prize-master on board; nor
did he endorse any of her papers; nor did he keep
company with her: and yet we find her doing exact-
ly what she was verbally directed to do. It is
faintly pretended, that if she had attempted, after
that, to go to Carthagena, she could not have escaped
the British cruisers which swarmed about the island.
But what greater danger, if the property were neutral,
would ensue on a capture by any other British vessel
than by her going to a British port as prize to the
Decouverte, or by her orders? It is believed, then,
that her going to Jamaica was voluntary, and formed
part of the original plan; which opinion derives con-
siderable support from the fact of insurance having
been made, not only for *Carthagena*, but also for a
port *in the West Indies;* from the nature of the out-
ward cargo; from the readiness with which they
consented to dispose of it at that place, and procur-
ed another for this country promising a much greater
profit than any which at that time could have been
imported from Carthagena. There is yet a still
stronger circumstance to prove that the destination
of the Rugen to Carthagena was fictitious; and that
is, her meeting at Kingston a ship called the *Wan-*

*schop*, which had sailed from Savannah but a little
before the Rugen. On board of that vessel we find
Mr. *William Buhring*, a brother of the claimant, and
we have every reason to believe that she belonged,
with her cargo, to the same concern. The Wanschop,
it is also said, was destined for Porto Bello, on the
Spanish Main; but by a strange coincidence of events,
which can scarcely have been the effect of chance
alone, she also gets out of her course, falls in with the
same British vessel of war which afterwards board-
ed the Rugen; receives the like order to proceed to
Kingston, which she also very promptly, and with-
out any apparent reluctance, complied with. The
business of these two vessels is managed by the same
house in Kingston, and the proceeds of both of their
cargoes are invested in molasses, rum, &c., which
composed the return cargo of the Rugen. If the
property claimed were *bona fide* Swedish, it would
be superfluous to inquire whether the Rugen's
going to Jamaica were voluntary, or by coercion, a
subject of Sweden having, for aught that appears,
as good right to trade there as at Carthagena. But
if it belonged to the American gentlemen, who
have had an agency so conspicuous in the whole
of this business, (and that it did is our unanimous
opinion,) it will not be pretended that they could go
to Kingston unless by compulsion, or that they had
any right during the late war to purchase and bring
a cargo from any British port to this or any other
country.

The court having already expressed its opinion,
that this vessel and cargo did not belong to the

claimant, but to citizens of the United States, the latter having been purchased at Kingston, as is believed, with their funds; it becomes quite unnecessary to inquire what was the real destination of the Rugen on her leaving Kingston; whether she were bound, in fact, to Amelia Island, or to the United States; although it might not be very difficult to come to a satisfactory conclusion that Hardwicke, in Georgia, was her real port of destination. But this examination is unnecessary; for the owners, being American citizens, are equally guilty of trading with the enemy, whether that trade were carried on between a British port and the United States, or between such port and any foreign nation; and in the present case, if the court be correct in the view which it has taken of the evidence, the offence of trading with the enemy was complete the moment the Rugen sailed from Savannah with an intention to carry her cargo to Kingston, in Jamaica. Upon the whole, without taking notice of many of the arguments urged by the advocates of the captors in favour of condemnation, and which are entitled to great consideration, the court is unanimously of opinion, that the decree of the circuit court, rejecting the claim of Mr. Buhring, was correct, and must, in all things, be affirmed.

Sentence affirmed with costs.