(Slip Opinion) OCTOBER TERM, 2021 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## DENEZPI *v.* UNITED STATES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

No. 20–7622.   Argued February 22, 2022—Decided June 13, 2022

An officer with the federal Bureau of Indian Affairs filed a criminal complaint against Merle Denezpi, a member of the Navajo Nation, charging Denezpi with three crimes alleged to have occurred at a house located within the Ute Mountain Ute Reservation: assault and battery, in violation of 6 Ute Mountain Ute Code §2; terroristic threats, in violation of 25 CFR §11.402; and false imprisonment, in violation of 25 CFR §11.404.  The complaint was filed in a CFR court, a court which administers justice for Indian tribes in certain parts of Indian country "where tribal courts have not been established."  §11.102.  Denezpi pleaded guilty to the assault and battery charge and was sentenced to time served—140 days' imprisonment.  Six months later, a federal grand jury in the District of Colorado indicted Denezpi on one count of aggravated sexual abuse in Indian country, an offense covered by the federal Major Crimes Act.  Denezpi moved to dismiss the indictment, arguing that the Double Jeopardy Clause barred the consecutive prosecution.  The District Court denied Denezpi's motion.  Denezpi was convicted and sentenced to 360 months' imprisonment.  The Tenth Circuit affirmed.

*Held*: The Double Jeopardy Clause does not bar successive prosecutions of distinct offenses arising from a single act, even if a single sovereign prosecutes them.  Pp. 4–13.

 (a) The Double Jeopardy Clause of the Fifth Amendment provides: "No person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb."  By its terms, the Clause does not prohibit twice placing a person in jeopardy "'for the same *conduct* or *actions*,'" *Gamble* v. *United States*, 587 U. S. ___, ___, but focuses on whether successive prosecutions are for the same "offence."  In 1791, "offence" meant the violation of a law.  See *ibid.*  Because the sovereign source

of a law is an inherent and distinctive feature of the law itself, an offense defined by one sovereign is necessarily a different offense from that of another sovereign. See *id.*, at \_\_\_. The two offenses can therefore be separately prosecuted without offending the Double Jeopardy Clause—even if they have identical elements and could not be separately prosecuted if enacted by a single sovereign. See *id.*, at \_\_\_, n. 1, \_\_\_. This dual-sovereignty principle applies where "two entities derive their power to punish from wholly independent sources." *Puerto Rico* v. *Sánchez Valle*, 579 U. S. 59, 68.

Denezpi's single act transgressed two laws: the Ute Mountain Ute Code's assault and battery ordinance and the United States Code's proscription of aggravated sexual abuse in Indian country. The Ute Mountain Ute Tribe exercised its "unique" sovereign authority in adopting the tribal ordinance. See *United States* v. *Wheeler*, 435 U. S. 313, 323. Likewise, Congress exercised the United States' sovereign power in enacting the federal criminal statute. See *United States* v. *Lanza*, 260 U. S. 377, 382. The two laws—defined by separate sovereigns—proscribe separate offenses, so Denezpi's second prosecution did not place him in jeopardy again "for the same offence." Pp. 4–6.

(b) Denezpi argues that the dual-sovereignty doctrine applies only when offenses are enacted *and* enforced by separate sovereigns. He insists that his second prosecution violated double jeopardy, then, because prosecutors in CFR courts exercise federal authority, which means that he was prosecuted twice by the United States. The Court need not decide whether prosecutors in CFR courts exercise tribal or federal authority because the Double Jeopardy Clause does not prohibit successive prosecutions by the same sovereign; rather, it prohibits successive prosecutions "for the same offence." Thus, even if Denezpi is right that the Federal Government prosecuted his tribal offense, the Clause did not bar the Federal Government from prosecuting him under the Major Crimes Act too. The Double Jeopardy Clause does not ask who puts a person in jeopardy. It zeroes in on what the person is put in jeopardy for: the "offence." The Court has seen no evidence that "offence" was originally understood to encompass both the violation of the law and the identity of the prosecutor.

Denezpi stitches together loose language from the Court's precedent to support his position that the identity of the prosecuting sovereign matters under the dual-sovereignty doctrine. No precedent cited by Denezpi involves or even mentions the unusual situation of a single sovereign successively prosecuting its own law and that of a different sovereign. In any event, imprecise statements cannot overcome the holdings of the Court's cases, not to mention the text of the Clause. Those authorities make clear that enactment is what counts in deter-

mining whether the dual-sovereignty doctrine applies. Denezpi's reliance on *Bartkus* v. *Illinois*, 359 U. S. 121, is misplaced. At most, *Bartkus* acknowledged that successive federal prosecutions for the same conduct would raise a double jeopardy question, but *Bartkus* did not begin to analyze, much less answer, that question.

Denezpi's remaining arguments are unavailing. Denezpi first points to the Government's exclusion of Major Crimes Act felonies from the federal regulatory offenses enforceable in CFR court in order to avoid double jeopardy concerns. He asserts that this "limitation borders on a concession that the Double Jeopardy Clause bars [his] second prosecution." Brief for Petitioner 29. Not so. Federal regulatory crimes are defined by the Federal Government, so successive prosecutions for a federal regulatory crime and a federal statutory crime present a different double jeopardy question from the one here.

Next, Denezpi argues that permitting successive prosecutions like his "does not further the purposes underlying the dual-sovereignty doctrine," namely, advancing sovereigns' independent interests. *Id.*, at 28–29. Purposes aside, the doctrine "follows from" the Clause's text, which controls. *Gamble*, 587 U. S., at \_\_\_–\_\_\_. In any event, the Tribe's sovereign interest *is* furthered when its assault and battery ordinance—duly enacted by its governing body as an expression of the Tribe's condemnation of that crime—is enforced, regardless of who enforces it.

Finally, Denezpi asserts that the Court's conclusion might lead sovereigns to assume more broadly the authority to enforce other sovereigns' criminal laws in order to get two bites at the apple. If a constitutional barrier to such cross-enforcement exists, it does not derive from the Double Jeopardy Clause. Pp. 6–13.

979 F. 3d 777, affirmed.

BARRETT, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, BREYER, ALITO, and KAVANAUGH, JJ., joined. GORSUCH, J., filed a dissenting opinion, in which SOTOMAYOR and KAGAN, JJ., joined as to Parts I and III.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 20–7622

MERLE DENEZPI, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

[June 13, 2022]

JUSTICE BARRETT delivered the opinion of the Court.

The Double Jeopardy Clause protects a person from being prosecuted twice "for the same offence." An offense defined by one sovereign is necessarily different from an offense defined by another, even when the offenses have identical elements. Thus, a person can be successively prosecuted for the two offenses without offending the Clause. We have dubbed this the "dual-sovereignty" doctrine.

This case presents a twist on the usual dual-sovereignty scenario. The mine run of these cases involves two sovereigns, each enforcing its own law. This case, by contrast, arguably involves a single sovereign (the United States) that enforced its own law (the Major Crimes Act) after having separately enforced the law of another sovereign (the Code of the Ute Mountain Ute Tribe). Petitioner contends that the second prosecution violated the Double Jeopardy Clause because the dual-sovereignty doctrine requires that the offenses be both enacted *and* enforced by separate sovereigns.

We disagree. By its terms, the Clause prohibits separate prosecutions for the same offense; it does not bar successive prosecutions by the same sovereign. So even assuming that

petitioner's first prosecutor exercised federal rather than tribal power, the second prosecution did not violate the Constitution's guarantee against double jeopardy.

## I

### A

In 1882, Secretary of the Interior H. M. Teller wrote to his Department's Office of Indian Affairs (now known as the Bureau of Indian Affairs) to suggest that the Office "formulate certain rules for the government of the Indians on the reservations." Letter to H. Price, Comm'r of Indian Affairs (Dec. 2, 1882), in Dept. of Interior, Rules Governing the Court of Indian Offenses 3–4 (1883). In response, the Commissioner of Indian Affairs adopted regulations prohibiting certain acts and directing that a "Court of Indian Offenses" be established for nearly every Indian tribe or group of tribes to adjudicate rule violations. *Id.*, at 5. Given their basis in what is now the Code of Federal Regulations, the courts are sometimes called CFR courts.

Today, most tribes have established their own judicial systems, thereby displacing the CFR courts. See 25 CFR §11.104 (2021). But some tribes, often due to resource constraints, have not. Five CFR courts remain, serving 16 of the more than 500 federally recognized tribes. Their stated purpose is "to provide adequate machinery for the administration of justice for Indian tribes" in certain parts of Indian country "where tribal courts have not been established." §11.102. The Department's Assistant Secretary for Indian Affairs appoints CFR court judges, called magistrates, subject to a confirmation vote by the governing body of the tribe that the court serves. §11.201(a). The Assistant Secretary may remove magistrates for cause of his own accord or upon the recommendation of the tribal governing

body. §11.202.[1] Unless a contract with a tribe provides otherwise, a Department official appoints the prosecutor for each CFR court. §11.204.

CFR courts have jurisdiction over two sets of crimes. See §11.114. First, federal regulations set forth a list of offenses that may be enforced in CFR court. See §§11.400–11.454. In addition, a tribe's governing body may enact ordinances that, when approved by the Assistant Secretary, are enforceable in CFR court and supersede any conflicting federal regulations. §§11.108, 11.449.

B

The reservation of the Ute Mountain Ute Tribe spans over 500,000 acres in southwestern Colorado, northern New Mexico, and southeastern Utah. The Tribe has more than 2,000 members. It has not created its own court system, so it makes use of the Southwest Region CFR Court. The Tribe has, however, adopted its own penal code, which is enforceable in that court.

A violation of the tribal code lies at the heart of this case. Merle Denezpi and V. Y., both members of the Navajo Nation, traveled to Towaoc, Colorado, a town within the Ute Mountain Ute Reservation. While the two were alone at a house belonging to Denezpi's friend, Denezpi barricaded the door, threatened V. Y., and forced her to have sex with him. After Denezpi fell asleep, V. Y. escaped from the house and reported Denezpi to tribal authorities.

An officer with the federal Bureau of Indian Affairs filed a criminal complaint in CFR court. That complaint charged Denezpi with three crimes: assault and battery, in violation of 6 Ute Mountain Ute Code §2 (1988); terroristic threats, in violation of 25 CFR §11.402; and false imprisonment, in

---

[1] The CFR court at issue in this case serves only the Ute Mountain Ute Tribe. Some CFR courts, however, serve multiple tribes. In that event, the governing bodies of all affected tribes participate in the confirmation and removal of magistrates. 25 CFR §§11.201(a), 11.202.

violation of 25 CFR §11.404.  Denezpi pleaded guilty to the assault and battery charge, and the prosecutor dismissed the other charges.  The Magistrate sentenced Denezpi to time served—140 days' imprisonment.

Six months later, a federal grand jury in the District of Colorado indicted Denezpi on one count of aggravated sexual abuse in Indian country, an offense covered by the federal Major Crimes Act.  18 U. S. C. §§2241(a)(1), (a)(2), 1153(a).  Denezpi moved to dismiss the indictment, arguing that the Double Jeopardy Clause barred the consecutive prosecution, but the District Court denied the motion.  After a jury convicted Denezpi, the District Court sentenced him to 360 months' imprisonment.

The Tenth Circuit affirmed.  It concluded that the second prosecution in federal court did not constitute double jeopardy because the Ute Mountain Ute Tribe's inherent sovereignty was the ultimate source of power undergirding the earlier prosecution in CFR court.  979 F. 3d 777, 781–783 (2020).  We granted certiorari.  595 U. S. ___ (2021).

## II
### A

The Double Jeopardy Clause of the Fifth Amendment provides: "No person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb."  The Clause by its terms does not prohibit twice placing a person in jeopardy "'for the same *conduct* or *actions*.'"  *Gamble* v. *United States*, 587 U. S. ___, ___ (2019) (slip op., at 3).  Instead, it focuses on whether successive prosecutions are for the same "offence."

That term, we have explained, "'was commonly understood in 1791 to mean "transgression," that is, "the Violation or Breaking of a Law."'"  *Ibid.*; see, *e.g.*, 2 R. Burn & J. Burn, A New Law Dictionary 167 (1792) ("OFFENCE, is an act committed against law, or omitted where the law requires it").  An offense, then, is "defined by a law."  *Gamble*,

587 U. S., at \_\_\_ (slip op., at 4); see *Moore* v. *Illinois*, 14 How. 13, 19–20 (1852). And a law is defined by the sovereign that makes it, expressing the interests that the sovereign wishes to vindicate. *Gamble*, 587 U. S., at \_\_\_ (slip op., at 4); see *United States* v. *Lanza*, 260 U. S. 377, 382 (1922) ("Each government in determining what shall be an offense against its peace and dignity is exercising its own sovereignty, not that of the other"). Because the sovereign source of a law is an inherent and distinctive feature of the law itself, an offense defined by one sovereign is necessarily a different offense from that of another sovereign. See *Gamble*, 587 U. S., at \_\_\_ (slip op., at 4); *Moore*, 14 How., at 20. That means that the two offenses can be separately prosecuted without offending the Double Jeopardy Clause—even if they have identical elements and could not be separately prosecuted if enacted by a single sovereign. See *Gamble*, 587 U. S., at \_\_\_, n. 1, \_\_\_ (slip op., at 3, n. 1, 4); cf. *Blockburger* v. *United States*, 284 U. S. 299, 304 (1932) (offenses defined by a single sovereign are distinct offenses only if each "requires proof of a different element").

This dual-sovereignty principle applies where "two entities derive their power to punish from wholly independent sources." *Puerto Rico* v. *Sánchez Valle*, 579 U. S. 59, 68 (2016). The doctrine has come up most frequently in the context of the States. See, *e.g.*, *Heath* v. *Alabama*, 474 U. S. 82, 88–90 (1985) (States are separate sovereigns from one another); *Lanza*, 260 U. S., at 382 (States are separate sovereigns from the United States). It applies, however, to Indian tribes too.

*United States* v. *Wheeler*, 435 U. S. 313 (1978), is the seminal case. There, a member of the Navajo Tribe was convicted in tribal court of violating a provision of the Navajo Tribal Code; he was later charged in federal court with violating a federal statute based on the same underlying conduct. *Id.*, at 314–316. Citing the dual-sovereignty doctrine, the Court rejected Wheeler's double jeopardy argument.

We explained that before Europeans arrived on this continent, tribes "were self-governing sovereign political communities" with "the inherent power to prescribe laws for their members and to punish infractions of those laws." *Id.*, at 322–323. While "Congress has in certain ways regulated the manner and extent of the tribal power of self-government," Congress did not "*creat[e]*" that power. *Id.*, at 328. When a tribe enacts criminal laws, then, "it does so as part of its retained sovereignty and not as an arm of the Federal Government." *Ibid.* Thus, Wheeler's prosecution for a tribal offense did not bar his later prosecution for a federal offense.

Our reasoning in *Wheeler* controls here. Denezpi's single act transgressed two laws: the Ute Mountain Ute Code's assault and battery ordinance and the United States Code's proscription of aggravated sexual abuse in Indian country. The Ute Mountain Ute Tribe, like the Navajo Tribe in *Wheeler*, exercised its "unique" sovereign authority in adopting the tribal ordinance. *Id.*, at 323. Likewise, Congress exercised the United States' sovereign power in enacting the federal criminal statute. See *Lanza*, 260 U. S., at 382. The two laws, defined by separate sovereigns, therefore proscribe separate offenses. Because Denezpi's second prosecution did not place him in jeopardy again "for the same offence," that prosecution did not violate the Double Jeopardy Clause.

B

Denezpi agrees with much of this—that sovereigns define distinct offenses, that the Tribe and the United States are separate sovereigns, and that his prosecutions involved a tribal offense and a federal offense respectively. See Reply

Brief 3–4.[2]  But he argues that the dual-sovereignty doctrine is concerned not only with who defines the offense, but also with who *prosecutes* it.  In *Wheeler*, the defendant was initially prosecuted in a tribal court; Denezpi, by contrast, was initially prosecuted in a CFR court.  While tribal prosecutors in tribal courts indisputably exercise tribal authority, Denezpi claims that prosecutors in CFR courts exercise federal authority because they are subject to the control of the Bureau of Indian Affairs.  He concludes that he was therefore prosecuted twice by the United States.  And that, he insists, violated the Double Jeopardy Clause because "the dual-sovereignty doctrine does not apply when successive prosecutions are undertaken by a single sovereign, regardless of the source of the power to adopt the criminal codes enforced in each prosecution."  Brief for Petitioner 16–17.[3]

───────────

[2] The dissent, unwilling to accept Denezpi's framing of the case, asserts that his first conviction was for a federal offense because CFR court regulations assimilated the Tribe's assault and battery ordinance. *Post*, at 6–9 (opinion of GORSUCH, J.).  The dissent is right that we do not address that point.  Instead, we take the case as it comes to us: No party pressed the assimilation argument, here or below, and no lower court addressed it.  Moreover, the answer to the question is not as obvious as the dissent claims.  For example, while the dissent says that the relevant regulations "could not be plainer," *post*, at 6, they are much less clear than the Assimilative Crimes Act, which makes a person who violates a state law on a federal enclave situated in that State "guilty of a like offense and subject to a like punishment." 18 U. S. C. §13(a).  Nor, despite the dissent's argument to the contrary, is it dispositive that the Assistant Secretary must approve a tribal ordinance before it can be enforced in CFR court— the Secretary of the Interior had to approve the Tribal Code at issue in *Wheeler* too.  435 U. S., at 327.  In short, the assimilation question is complex, making it particularly imprudent to raise and resolve it *sua sponte* as the dissent proposes to do.

[3] At times, the dissent suggests that the source of the trial court's power, rather than (or perhaps in addition to) the source of the prosecutor's power, matters in the dual-sovereignty analysis.  See *post*, at 10–

We need not sort out whether prosecutors in CFR courts exercise tribal or federal authority because we disagree with Denezpi's premise. The Double Jeopardy Clause does *not* prohibit successive prosecutions by the same sovereign. It prohibits successive prosecutions "for the same offence." And as we have already explained, an offense defined by one sovereign is different from an offense defined by another. Thus, even if Denezpi is right that the Federal Government prosecuted his tribal offense, the Clause did not bar the Federal Government from prosecuting him under the Major Crimes Act too.

1

Denezpi does not even try to reconcile his position with the text of the Clause. Instead, he presents the dual-sovereignty doctrine as "a carveout to the rule against double jeopardy" and argues that the carveout does not extend to successive prosecutions by a single sovereign. Brief for Petitioner 15–17. But Denezpi is wrong to treat the dual-sovereignty doctrine as an exception to the Clause. *Gamble* was very clear on this point: "Although the dual-sovereignty rule is often dubbed an 'exception' to the double jeopardy right, it is not an exception at all. On the contrary, it follows from the text that defines that right in the first place." 587 U. S., at ___ (slip op., at 3). The Clause does not ask who puts a person in jeopardy. It zeroes in on what the person is put in jeopardy for: the "offence." And again, in 1791, "offence" meant the violation of a law. *Supra,* at 4–5. We have seen no evidence that "offence" was originally understood to encompass both the violation of the law and the identity of the prosecutor.

Treating the identity of the prosecutor as part of the definition of "offence" is as odd as it sounds. An offense has

--------

11. Again the dissent strays from Denezpi's argument, which has focused on the source of the prosecutor's authority. See, *e.g.*, Tr. of Oral Arg. 9–11.

always referred to the crime itself, which is complete when
a person has carried out all of its elements. See, *e.g.*, *The
Rugen*, 1 Wheat. 62, 74 (1816) ("[T]he offence of trading
with the enemy was complete the moment the [ship] sailed
from Savannah with an intention to carry her cargo to
Kingston, in Jamaica"); *United States* v. *Norris*, 300 U. S.
564, 574 (1937) (the "crime of perjury . . . is complete when
a witness's statement has once been made"); *Toussie* v.
*United States*, 397 U. S. 112, 117 (1970) (draft registration
"was thought of as a single, instantaneous act to be per-
formed at a given time, and failure to register at that time
was a completed criminal offense"). The law has long rec-
ognized, then, that an offense is committed before it is pros-
ecuted. For example, the Constitution says that "[t]he Trial
of all Crimes . . . shall be held in the State where the said
Crimes shall have been committed." Art. III, §2, cl. 3; see
Amdt. 6 ("In all criminal prosecutions, the accused shall" be
tried "by an impartial jury of the State and district wherein
the crime shall have been committed"). And Sir Matthew
Hale could say of a man who breaks into a house and steals
something: "[I]f indicted for the burglary and acquitted, yet
he may be indicted of the larciny, for they are several of-
fenses, tho committed at the same time." 2 History of the
Pleas of the Crown 245–246 (1736). In addition, Chief Jus-
tice Marshall, speaking for the Court, described a section of
the Crimes Act of 1790 as providing that "if manslaughter
be committed in [certain places], the offender may be pros-
ecuted in the federal Courts." *United States* v. *Wiltberger*,
5 Wheat. 76, 98 (1820). So Denezpi's proposal would put us
in the position of holding that a person's single act consti-
tutes two separate offenses at the time of commission (be-
cause the act violates two different sovereigns' laws) but
that those offenses later become the same offense if a single
sovereign prosecutes both. He offers no textual justification
for this nonsensical result.

2

With the text against him, the best Denezpi can do is stitch together loose language from our precedent. For example, we have said that "two offenses 'are not the "same offence"' for double jeopardy purposes if 'prosecuted by different sovereigns.'" *Gamble*, 587 U. S., at ___ (slip op., at 2) (emphasis deleted); see *Wheeler*, 435 U. S., at 329–330 ("Since tribal and federal prosecutions are brought by separate sovereigns, they are not 'for the same offence'"). In another case, we stated that "[i]f an entity's authority to enact and enforce criminal law ultimately comes from Congress, then it cannot follow a federal prosecution with its own." *Sánchez Valle*, 579 U. S., at 77; see *id.*, at 62 ("[T]he issue is only whether the prosecutorial powers of the two jurisdictions have independent origins"). And we have remarked that "the crucial determination [under the dual-sovereignty doctrine] is whether the two entities that seek successively to prosecute a defendant for the same course of conduct can be termed separate sovereigns." *Heath*, 474 U. S., at 88.

Read in isolation, these statements help Denezpi's position that the identity of the prosecuting sovereign matters under the dual-sovereignty doctrine. Read in context, their helpfulness dissipates. None of these cases involves or even mentions the unusual situation of a single sovereign successively prosecuting its own law and that of a different sovereign. This language appears in the context of the usual situation: a sovereign (or alleged sovereign) prosecuting its own laws.[4] Because enactment and enforcement almost always go hand in hand, it is easy to overlook that they are

—————

[4] In *Puerto Rico* v. *Sánchez Valle*, 579 U. S. 59 (2016), Puerto Rico sought to enforce its own territorial laws; the question, which we answered in the negative, was whether Puerto Rico was an independent sovereign from the United States for purposes of the Clause. *Id.*, at 65–66; see also *Waller* v. *Florida*, 397 U. S. 387, 392–395 (1970) (cities are not separate sovereigns from States).

occasionally separated. That is particularly good reason to take the language Denezpi offers with a healthy sprinkling of salt. Where it was not important to attend to the difference between enactment and enforcement, it is understandable why we did not. In any event, imprecise statements cannot overcome the holdings of our cases, not to mention the text of the Clause—and those authorities make clear that enactment is what counts in determining whether the dual-sovereignty doctrine applies. See Part II–A, *supra.*

Denezpi points to only one case in which the Court dealt with an argument in the neighborhood of his. In *Bartkus* v. *Illinois*, 359 U. S. 121 (1959), the defendant argued that his acquittal in federal court for a federal offense barred his later conviction in state court for a state offense based on the same underlying conduct. There was a threshold issue of whether to analyze the claim under the Fifth Amendment's Double Jeopardy Clause or the Fourteenth Amendment's Due Process Clause. The Double Jeopardy Clause had not yet been incorporated against the States, but the defendant argued that federal authorities had run his state prosecution, making it federal action to which the Clause applied. The Court rejected that argument, seeing no basis to say that "Illinois in bringing its prosecution was merely a tool of the federal authorities," rendering the "state prosecution . . . a sham and a cover for a federal prosecution." *Id.*, at 122–124. That resolution meant that the Court had no occasion to consider whether the Double Jeopardy Clause would have barred the Federal Government from separately prosecuting Bartkus for a violation of state law. Instead, we considered whether Bartkus' successive federal and state prosecutions violated due process. See *id.*, at 124.

*Bartkus* does not give Denezpi much to go on—as Denezpi himself recognizes. See Brief for Petitioner 16–17 (*Bartkus* "suggest[s]" that the dual-sovereignty doctrine will not apply if "a second prosecution by an apparently separate sov-

ereign is 'in essential fact' just a 'cover' for a second prose-
cution by the first sovereign"). At most, *Bartkus* acknowl-
edged that a successive federal prosecution would raise a
double jeopardy question. Yet it did not begin to analyze,
much less answer, that question. In the end, then, *Bartkus*
is no more help to Denezpi than the other cases on which
he relies.

3

Denezpi advances a few other arguments for why the
Double Jeopardy Clause barred his second prosecution.
None succeeds.

First, he notes that the United States has excluded from
the string of federal regulatory offenses enforceable in CFR
court those "[f]elonies that are covered by the Major Crimes
Act." 58 Fed. Reg. 54406 (1993). And it has done so "to
avoid the possibility that someone who has committed a se-
rious offense may be immunized from federal prosecution
[under that Act] because of the prohibition against double
jeopardy by a prosecution in a Court of Indian Offenses."
*Ibid.* Denezpi asserts that this "limitation borders on a con-
cession that the Double Jeopardy Clause bars [his] second
prosecution." Brief for Petitioner 29. We disagree. Federal
regulatory crimes are defined by the Federal Government,
so successive prosecutions for a federal regulatory crime
and a federal statutory crime present a different double
jeopardy question from the one presented here.

Next, Denezpi argues that permitting successive prosecu-
tions like his "does not further the purposes underlying the
dual-sovereignty doctrine," namely, advancing sovereigns'
independent interests. *Id.*, at 28–29. Purposes aside, the
doctrine "follows from" the Clause's text, which controls.
*Gamble*, 587 U. S., at \_\_\_–\_\_\_ (slip op., at 3–4). In any
event, the Tribe's sovereign interest *is* furthered when its
assault and battery ordinance—duly enacted by its govern-
ing body as an expression of the Tribe's condemnation of

that crime—is enforced, regardless of who enforces it.

Finally, Denezpi asserts that the conclusion we reach might lead to "highly troubling" results. Brief for Petitioner 30–32. He suggests that sovereigns might more broadly assume the authority to enforce other sovereigns' criminal laws in order to get two bites at the apple. But if there is a constitutional barrier to such cross-enforcement, it does not derive from the Double Jeopardy Clause. As we have explained, the Clause does not bar successive prosecutions of distinct offenses, even if a single sovereign prosecutes them.

*    *    *

Denezpi's single act led to separate prosecutions for violations of a tribal ordinance and a federal statute. Because the Tribe and the Federal Government are distinct sovereigns, those "offence[s]" are not "the same." Denezpi's second prosecution therefore did not offend the Double Jeopardy Clause. We affirm the judgment of the Court of Appeals.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 20–7622

_____

## MERLE DENEZPI, PETITIONER *v.* UNITED STATES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE TENTH CIRCUIT

[June 13, 2022]

JUSTICE GORSUCH, with whom JUSTICE SOTOMAYOR and
JUSTICE KAGAN join as to Parts I and III, dissenting.

Federal prosecutors tried Merle Denezpi twice for the
same crime. First, they charged him with violating a fed-
eral regulation. Then, they charged him with violating an
overlapping federal statute. Same defendant, same crime,
same prosecuting authority. Yet according to the Court, the
Double Jeopardy Clause has nothing to say about this case.
How can that be? To justify its conclusion, the Court in-
vokes the dual-sovereignty doctrine. For reasons I have of-
fered previously, I believe that doctrine is at odds with the
text and original meaning of the Constitution. See *Gamble*
v. *United States*, 587 U. S. \_\_\_, \_\_\_ (2019) (dissenting opin-
ion) (slip op., at 1). But even taking it at face value, the
doctrine cannot sustain the Court's conclusion.

### I

### A

To appreciate why, some background about the Court of
Indian Offenses helps. Unlike a tribal court operated by a
Native American Tribe pursuant to its inherent sovereign
authority, the Court of Indian Offenses is "part of the Fed-
eral Government." 58 Fed. Reg. 54407 (1993). Really, it is
a creature of the Department of the Interior. Secretary
H. M. Teller opened the court by administrative decree in
1883. As he put it, the court was designed to "civilize the

Indians" by forcing them to "desist from the savage and bar-
barous practices . . . calculated to continue them in sav-
agery." 1 Report of the Secretary of the Interior X (June 30,
1883). Apparently, the Secretary and his contemporaries
worried that too many Tribes were under "the influence of
medicine men" and "without law of any kind," and they
thought the Interior Department needed to take a strong
hand to impose "some rule of government on the reserva-
tions." *Id.*, at X–XI.

Toward these ends, the Secretary instructed the Commis-
sioner of Indian Affairs to promulgate "certain rules" to es-
tablish a new "tribunal" and to define new "offenses of
which it was to take cognizance." *Id.*, at XII. The resulting
"court" was composed of magistrates appointed by the De-
partment who could "read and write English readily, w[ore]
citizens' dress, and engage[d] in civilized pursuits." Report
of the Commissioner of Indian Affairs 28 (1892) (1892 Re-
port). The Department likewise appointed officers charged
with investigating the crimes it created. Federal Office of
Child Support Enforcement, IM–07–03, Tribal and State
Jurisdiction To Establish and Enforce Child Support 10
(2007). And the regulatory criminal code the Department
produced outlawed everything from "old heathenish
dances" and "medicine men" and their "conjurers' arts" to
certain Indian mourning practices. Rules Governing the
Court of Indian Offenses 3–7 (1883) (1883 Rules). The De-
partment's new criminal code also assimilated "the laws of
the State or Territory within which the reservation may be
located," and instructed that sentences for assimilated of-
fenses should match those imposed by state or territorial
law. 1892 Report 30. Unsurprisingly, tribal members often
regarded these courts as "foreign" and "hated" institutions.
V. Deloria & C. Lytle, American Indians, American Justice
115–116 (1983).

Over time, as the federal government's attitude toward

Native American traditions changed, the Department adjusted certain aspects of its regime. Now, some of the old federal offenses aimed at punishing tribal customs are gone. But the regulations still list many crimes created by federal agency officials. 25 CFR §§ 11.400–11.454 (2021). And the regulations continue to assimilate other crimes too. Instead of assimilating state and territorial crimes, federal regulations today assimilate tribal crimes. They do so, however, only if and to the extent those tribal crimes are "approved by the Assistant Secretary [of] Indian Affairs or his or her designee." § 11.449. As before, any federal punishment for assimilated offenses may not exceed the sentence provided for by the assimilated (here, tribal) law. *Ibid.* Even today, prosecutors continue to be hired and controlled by the Department unless a Tribe opts out of that arrangement. § 11.204. Likewise, the Department retains full authority to "appoint a magistrate without the need for confirmation by the Tribal governing body." 85 Fed. Reg. 10714 (2020). And the Department retains the power to remove these adjudicators. See 25 CFR § 11.202.

B

These arrangements turned out to play a pivotal role in Mr. Denezpi's case. In July 2017, he traveled to visit his girlfriend in Towaoc, Colorado, a town within the Ute Mountain Ute Reservation. His traveling companion, a woman known as V. Y., alleged that during the visit Mr. Denezpi sexually assaulted her. Mr. Denezpi claimed the encounter was consensual. Both Mr. Denezpi and V. Y. are members of the Navajo Nation.

After a brief investigation, an agent of the Department of the Interior swore out a criminal complaint on behalf of the "United States of America, Plaintiff." App. 9–10. Federal officials charged Mr. Denezpi with three offenses: terroristic threats, false imprisonment, and assault and battery. Federal regulations define the first two offenses. See

25 CFR §§ 11.402, 11.404. The third offense—assault and battery—is an assimilated Ute Mountain Ute tribal offense "approved" by federal officials. § 11.449. Ultimately, federal authorities dismissed the first two charges and Mr. Denezpi pleaded no contest to the third while maintaining his innocence. Pursuant to federal regulation, the court was empowered to sentence Mr. Denezpi to no more than six months in prison for his crime, the maximum punishment the assimilated tribal law permits. *Ibid.* Ultimately, the court sentenced him to 140 days—a punishment just shy of the maximum.

After further consideration, it seems federal authorities may have regretted their hasty prosecution. It seems too they may have considered the punishment authorized by tribal law and their own regulations insufficient. Six months after Mr. Denezpi finished his Interior Department sentence, the Justice Department brought new charges against him for the same offense under federal statutory law. These new charges carried the potential for a much longer sentence, one unconnected to tribal judgments about the appropriate punishments for tribal members. See 18 U. S. C. §§ 2241(a), 1153(a). In time, a federal district court convicted Mr. Denezpi and sentenced him to an additional 30 years in prison, followed by 10 years of supervised release.

Throughout, Mr. Denezpi has argued that the Constitution's Double Jeopardy Clause barred his second prosecution. The Clause provides that no person shall be "twice put in jeopardy" "for the same offense." Amdt. 5. No one disputes that Mr. Denezpi's first crime of conviction (assault and battery) is a lesser included offense of his second crime of conviction (aggravated sexual abuse). And no one disputes that, under our precedents, that is normally enough to render them the "same offense" and forbid a second prosecution. *Blockburger* v. *United States*, 284 U. S. 299, 304 (1932). Yet both the District Court and Court of Appeals

rejected Mr. Denezpi's argument, so he brought it here.

## II

By anyone's account, the Court of Indian Offenses is a curious regime. When instructing agency officials to create the Court of Indian Offenses, neither Secretary Teller nor anyone else pointed to any Act of Congress authorizing the project. On the contrary, from the beginning, federal officials recognized that these "'so-called courts'" rested on a "shaky legal foundation." W. Hagan, Indian Police and Judges: Experiments in Acculturation and Control 110 (1966). Even more than that, one might wonder how an executive agency can claim the exclusive power to define, prosecute, and judge crimes—three distinct functions the Constitution normally reserves for three separate branches. See, *e.g.*, *United States* v. *Brown*, 381 U. S. 437, 442–443 (1965). In these proceedings, however, Mr. Denezpi has not questioned whether the Court of Indian Offenses is statutorily authorized. Nor has he questioned whether the Constitution permits executive officials rather than a judge and jury to try him for crimes. Accordingly, those questions—long lingering and incredibly still unanswered—remain for another day.

Focusing on Mr. Denezpi's double jeopardy claim, the Court finds no constitutional violation thanks to the "dual-sovereignty doctrine." Under that doctrine, even successive prosecutions under identical criminal laws may be permissible if they are "brought by different sovereigns." *Puerto Rico* v. *Sánchez Valle*, 579 U. S. 59, 66–67 (2016). To my mind, that doctrine has no place in our constitutional order. See *Gamble*, 587 U. S., at \_\_\_ (GORSUCH, J., dissenting) (slip op., at 1). But even taking the doctrine on its own terms, it does not tolerate what transpired here.

This Court has long recognized that, unless carefully cabined, the dual-sovereignty doctrine can present serious dangers. Taken to its extreme, it might allow prosecutors to

coordinate and treat an initial trial in one jurisdiction as a dress rehearsal for a second trial in another. All of which would amount, in substance if not form, to successive trials for the same offense. See *Bartkus* v. *Illinois*, 359 U. S. 121, 123–124 (1959). For reasons like these, this Court has said repeatedly that the doctrine applies only when two requirements are satisfied. First, the two prosecutions must be brought under "the laws of two sovereigns." *Sánchez Valle*, 579 U. S., at 67. Second, the "two prosecuting *entities*" must "derive their power to punish from wholly independent [sovereign] sources." *Id.*, at 68 (emphasis added). Here, neither condition is satisfied.

### A

Start with the fact that both of Mr. Denezpi's convictions were for federal offenses. Almost in passing and with little analysis, the Court suggests that his first conviction was for a tribal offense and only his second involved a federal offense. *Ante*, at 6. But that is wrong. Mr. Denezpi's first prosecution in the Court of Indian Offenses was for the violation of federal regulations that assimilated tribal law into federal law.

The regulations could not be plainer. Subpart D of the regulations governing the Court of Indian Offenses is titled "Criminal Offenses." 25 CFR §§ 11.400–11.454. This subpart contains a list of federal regulatory crimes, many of which contain enumerated elements. Nested in this list is "§ 11.449: Violation of an approved tribal ordinance." That regulation declares that anyone who violates a tribal ordinance "approved by the Assistant Secretary [of] Indian Affairs" is "guilty of an offense"—that is, an offense under the Interior Department's own "Law and Order Code," Part 11. The regulation further provides that anyone guilty of violating it "shall be sentenced as provided in the [tribal] ordinance." § 11.449.

That is exactly what happened in Mr. Denezpi's first

prosecution. The Ute Mountain Ute have a tribal offense of assault and battery. By all indications, it was "approved" by the Assistant Secretary for assimilation into federal regulations. And for this federal regulatory crime, Mr. Denezpi was sentenced to a term of incarceration in a federal detention center. On any reasonable account, Mr. Denezpi was not convicted of a tribal offense. He was convicted of violating § 11.449, which assimilates federally approved tribal ordinances into federal law.

The regulation governing the Court of Indian Offenses' criminal jurisdiction confirms the conclusion. It states that, except as otherwise provided, the court has jurisdiction over "any action by an Indian . . . that is *made a criminal offense under this part*" by federal officials. § 11.114 (emphasis added). The italicized language clearly refers to the list of "Criminal Offenses" in Subpart D. And predictably enough, "the Ute Mountain Ute Code's assault and battery ordinance" is not on that list. *Ante*, at 6. What *is* on the list is a federal regulatory crime—"Violation of an approved tribal ordinance"—an offense that (to repeat) assimilates certain federally "approved" tribal laws. § 11.449.

Historical context further indicates that Mr. Denezpi was prosecuted for a federal regulatory crime. As we have seen, the Department of the Interior created the Court of Indian Offenses. And the Department wrote its own criminal code for enforcement in the court. Initially, that code included freestanding federal crimes outlawing everything from "heathenish dances" to "conjurers' arts." 1883 Rules 3–7. Other early regulations assimilated certain state and territorial laws into federal law and defined the punishment for these crimes by reference to these local laws. See Part I–A, *supra*. As we have seen, too, federal authorities have exercised the power to revise their code from time to time. They have eliminated some offenses and created others. They have chosen to end the assimilation of state and territorial offenses and incorporate instead certain "approved" tribal

offenses. Unless it should break some promise made to a particular Tribe, federal authorities could close the whole operation tomorrow just as they chose to open it in the first place.

Both text and context indicate that Mr. Denezpi was prosecuted in the Court of Indian Offenses for a federal crime, not a tribal one. That is the best reading of the relevant regulations. Nor would the result change if there were any reasonable doubt, for the rule of lenity would tip the balance in Mr. Denezpi's favor. See *Harrison* v. *Vose*, 9 How. 372, 378 (1850); *Wooden* v. *United States*, 595 U. S. ___, ___–___ (2022) (GORSUCH, J., concurring in judgment) (slip op., at 9–12).

B

Faced with so much competing evidence, how does the Court reply? It insists that *United States* v. *Wheeler*, 435 U. S. 313 (1978), "controls" our disposition of this case, mandating the conclusion that Mr. Denezpi's first prosecution was for a tribal offense, not a federal one. *Ante*, at 6.

That is mistaken. *Wheeler* held that, under the dual-sovereignty doctrine, the Double Jeopardy Clause did not bar federal prosecutors from pursuing a defendant after his conviction for an equivalent *tribal offense in tribal court.* 435 U. S., at 329–330. In doing so, the Court stressed that, "[b]efore the coming of the Europeans, the tribes were self-governing sovereign political communities." *Id.*, at 322–323. And the Court observed that "the power to punish offenses against tribal law committed by Tribe members" was part of inherent tribal "sovereignty, [which] has never been taken away from [Tribes], either explicitly or implicitly, and is attributable in no way to any delegation to them of federal authority." *Id.*, at 328.

Exactly none of that "controls" the disposition of this case. *Wheeler* involved a prosecution by tribal authorities exercising their retained sovereign authority to punish tribal

members before their own courts. It did not involve a prosecution by federal authorities before a federal tribunal. The Tribe's prosecution in *Wheeler* was clearly for a tribal offense too—contributing to the delinquency of a minor in violation of Title 17, § 321 of the Navajo Tribal Code. See 435 U. S., at 315–316. It did not involve a federal regulation that assimilates approved tribal ordinances. What is more, the Court in *Wheeler* expressly noted and specifically reserved the question presented here. It stated that it "need not decide" whether its holding applied to the Court of Indian Offenses. *Id.*, at 327, n. 26. And it reserved that question in part because it acknowledged that, unlike tribal courts, the Court of Indian Offenses may be an "arm of the Federal Government." *Ibid.* *Wheeler* settles nothing.

Aware of the weakness of its appeal to precedent, the Court ultimately retreats to another argument. It contends that Mr. Denezpi has "agree[d]" his first conviction was for a "tribal" rather than a "federal" offense. See *ante*, at 6–7. But if the Court intends to rely on a purported concession to reach its judgment in this case, lower courts and future litigants should see today's decision for what it is: a one-off, case-specific ruling. Whether the Court of Indian Offenses enforces federal regulatory offenses rather than tribal offenses remains an open question for other litigants to preserve and pursue—and its answer is clear.

## III

### A

Proceeding further only underscores Mr. Denezpi's entitlement to relief. As this Court expressly acknowledged in *Gamble*, the application of the dual-sovereignty doctrine does not turn solely on "the formal difference between two distinct criminal codes." 587 U. S., at ___ (slip op., at 5). It also turns on "the substantive differences between the interests that two sovereigns can have in punishing the same act." *Id.*, at ___–___ (slip op., at 5–6). So, for example, this

Court will find a Double Jeopardy Clause violation even if an individual is tried under two separate legal codes if the two prosecuting entities derive their ultimate authority from the same sovereign source. See *Sánchez Valle*, 579 U. S., at 67–68. Likewise, if one sovereign uses another's laws as a "cover" or "sham" for what in substance amounts to its own successive prosecution, it will violate the Clause. *Bartkus*, 359 U. S., at 123–124. Really, this aspect of our jurisprudence represents nothing more than a recognition that "what cannot be done directly cannot be done indirectly. The Constitution deals with substance, not shadows." *Cummings* v. *Missouri*, 4 Wall. 277, 325 (1867).

To honor the Double Jeopardy Clause in substance as well as form, our cases indicate that we must ask, among other things, whether "the 'entities that seek successively to prosecute a defendant . . . [are] separate sovereigns,'" based on "the deepest wellsprings . . . of [their] prosecutorial authority." *Sánchez Valle*, 579 U. S., at 67–68. "Whether two prosecuting entities are dual sovereigns in the double jeopardy context, we have stated, depends on whether they draw their authority to punish the offender from distinct sources of power. The inquiry is thus historical." *Id.*, at 68 (citation and internal quotation marks omitted). Under this inquiry, "[i]f two entities derive their power to punish from wholly independent sources . . . then they may bring successive prosecutions. Conversely, if those entities draw their power from the same ultimate source . . . then they may not." *Ibid.* (internal quotation marks omitted). So, for example, this Court has held that successive prosecutions for the same offense in a Puerto Rico court and a federal court are barred by the Double Jeopardy Clause because both ultimately derive their authority from Congress. *Id.*, at 73–77.

Applying these principles here, it is clear that the deepest historical wellsprings of the Court of Indian Offenses' authority lie not in the Ute Mountain Ute or any other Tribe,

but in the halls of the Department of the Interior. As we have seen, federal administrative authorities created this tribunal. Even today, federal officials continue to define and approve offenses for enforcement before it. They amend their list of offenses from time to time. They control the hiring and firing of prosecutors and magistrates. They opened this court; they may close it. The Court of Indian Offenses was and remains a federal scheme. See Part I–A, *supra*.

It would be deeply revisionist to suggest otherwise. Yes, the federal government has now eliminated many of its regulatory crimes aimed at expunging tribal traditions. Yes, some Tribes today see these courts as an alternative to creating their own tribal courts. But as the government's regulations make plain, the Court of Indian Offenses unambiguously remains "part of the Federal Government." 58 Fed. Reg. 54407. The federal government still exercises the authority to define its own offenses without reference to tribal law. And it enforces only those tribal ordinances its bureaucrats approve. If the courts of Puerto Rico are properly classified as federal under our case law, it defies the imagination to think administrative tribunals hatched by the Department of the Interior could be treated differently.

The facts of this case drive the point home. Federal authorities brought charges against Mr. Denezpi in his first prosecution in the name of the United States. Those who prosecuted him were employed and controlled by the federal government. See 25 CFR § 11.204; see also Brief for Ute Mountain Ute Tribe et al. as *Amici Curiae* 10. He was sentenced by a magistrate whom the federal government had the right to appoint and remove. See 85 Fed. Reg. 10714; 25 CFR § 11.202. And for his crime, Mr. Denezpi was incarcerated in a federal detention center. Federal agency officials played every meaningful role in his case: legislator, prosecutor, judge, and jailor.

There is more too.  Federal authorities apparently regret-
ted their hasty first prosecution.  And far from seeking to
vindicate tribal sentencing policy, it seems they may have
found it wanting.  So six months after the Interior Depart-
ment finished the first case, the Justice Department took
up the second.  This time federal authorities invoked fed-
eral statutes carrying exponentially longer sentences, ones
that care less about tribal sentencing policy for tribal mem-
bers.  Today, the federal government seeks license to follow
this same course in future cases too.  Whether viewed his-
torically or through the lens of this contemporary case, the
wellsprings here are federal through and through.

## B

Once more, the Court's reply is unpersuasive.  It admits
that, in case after case, this Court has emphasized that the
dual-sovereignty doctrine does not permit successive prose-
cutions by the same sovereign.  *Ante*, at 9–10.  Yet the Court
today tries to brush all these precedents aside, offhandedly
suggesting that each was mistaken.  *Ante*, at 10.  On its
telling, the only thing that matters is that Mr. Denezpi was
charged under two different sets of laws.  *Ibid.*  And here
again the Court proceeds on an assumption that Mr.
Denezpi was charged first under tribal law and then under
federal law.

But the dual-sovereignty doctrine has never exalted form
over substance in this way.  If taken to its extreme, the
Court's reasoning could seemingly allow a State to punish
an individual twice for identical offenses, so long as one is
proscribed by state law and the other by federal law.  It
would potentially allow the federal government to do the
same.  This Court has never before endorsed such a parsi-
monious and easily evaded understanding of the Double
Jeopardy Clause.

Notice, too, what the Court does *not* say.  In rejecting Mr.

Denezpi's arguments, it does not conclude that the Constitution *allows* successive prosecutions by one sovereign based on another sovereign's laws. Instead, it holds only that the "constitutional barrier to such cross-enforcement . . . does not derive from the Double Jeopardy Clause." *Ante*, at 12. The Court says nothing, for example, about whether the Due Process Clauses may have something to say on the subject. See Amdts. 5, 14. Under their terms, governments generally may not deprive citizens of liberty or property unless they do so according to "those settled usages and modes of proceeding" existing at common law. *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272, 277 (1856). And the Court points to no case blessing successive prosecutions by a single sovereign using its own and another's laws, much less any "settled" tradition of doing so. So here again, the Court's decision today leaves much open for the future.

\*

As early as the 1890s, observers expressed concern that the creation of the Court of Indian Offenses could make it "possible to try a man twice for the same offense," first for a federal regulatory offense, then for a federal statutory crime. Proceedings of the Eighth Annual Meeting of the Lake Mohonk Conference 32 (1890) (statement of T. Riggs). As they put it, a federal officer might "tak[e] up" a Native American who might then "spen[d] two or three days in the agency lockup" pursuant to federal regulatory charges, and "then for the same offense [might] be brought before [a federal district] court." *Ibid.* Today, that pessimistic prediction has proved true. It is hard to believe this Court would long tolerate a similar state of affairs in any other context—allowing federal bureaucrats to define an offense; prosecute, judge, and punish an individual for it; and then transfer the case to the resident U. S. Attorney for a second trial for the same offense under federal statutory law. Still, for

over a century that regime has persisted in this country for Native Americans, and today the Court extends its seal of approval to at least one aspect of it.  Worse, the Court does so in the name of vindicating tribal sovereign authority. *Ante*, at 6.  The irony will not be lost on those whose rights are diminished by today's decision.  Respectfully, I dissent.